No. 19,001.

THE STATE OF KANSAS, *Appellee,* v. JOHN DOE et al. (THE COLUMBIA BREWERY CO., *Appellant*).

SYLLABUS BY THE COURT.

1. INTOXICATING LIQUORS—*The Webb-Kenyon Act, Prohibiting the Shipping of Intoxicating Liquors into States for Use in Violation of Law, is Constitutional and Valid.* Under the act of congress of March 1, 1913, entitled "An act divesting intoxicating liquors of their interstate character in certain cases" (Part 1, 37 U. S. Statutes at Large, ch. 90, p. 699), intoxicating liquors are recognized as legitimate subjects of interstate commerce only when not intended for sale or use in violation of the laws of the destination state, and the fact that a carload of intoxicating liquor, seized in bulk at the place in this state to which it was consigned, was still in course of transportation originating in another state did not protect the liquor from condemnation consequent upon a judicial determination regularly made that it was intended for unlawful use in Kansas.

2. SAME. The act referred to is constitutional as against the objection that it delegates to the states the power of congress to regulate interstate commerce in intoxicating liquors and that the rule prescribed is not uniform in its operation.

Appeal from Cherokee district court; EDWARD E. SAPP, judge. Opinion filed April 11, 1914. Affirmed.

*Joseph T. Davis,* of Elk City, and *A. L. Majors,* of Columbus, for the appellant.

*John S. Dawson,* attorney-general, and *F. W. Boss,* county attorney, for the appellee; *E. M. Tracewell,* and *W. J. Moore,* both of Columbus, of counsel.

The opinion of the court was delivered by

BURCH, J.: The Columbia Brewery Company, of St. Louis, Mo., shipped a carload of beer from St. Louis, Mo., to the town of Carona, in Cherokee county, Kansas. On the arrival of the car at Carona it was placed by the carrier, the Missouri Pacific Railway Company, on a sidetrack, where the liquor was seized by the sheriff. Notices of seizure were duly served, and the brewing company answered, claiming the beer. After a trial the court found that the beer was being used in violation of the laws of this state, and ordered it destroyed. The brewing company appeals.

The beer was consigned to the shipper's order, with a direction on the waybill to notify James Depoli. The shipment was made according to a practice under which Depoli had received from the brewing company some seventy-two carloads of beer, for which he paid more than $43,000, all since January 13, 1912. When a car would arrive Depoli would be notified. He would find at the Mineral State Bank a draft drawn on him by the brewing company for the price of the consignment. He would take up the draft and receive with it a sealed envelope. Although nobody testified directly to the fact, this envelope would contain the bill of lading of the consignment, whereby Depoli would obtain possession of it from the carrier. Depoli was engaged in the wholesale liquor business in Cherokee county, in violation of law, and had ordered the carload of beer in question a few days before its arrival at Carona for use in his business. The car was placed on the sidetrack on April 21, 1913. The sheriff stationed a guard over it until the proper legal proceedings could be instituted, and the beer was formally seized on the morning of April 22. The draft for the shipment was received by the bank on April 22, and was not paid. While the trial was in progress, and after the cashier of the bank had been requested to

produce them, the draft and the sealed envelope accompanying it were returned to the brewing company.

All the foregoing facts were established at the trial, either by direct proof or by necessary inference from proved facts and circumstances, and furnish the foundation for the judgment of the district court. There was some evidence that Depoli was in fact simply the agent of the brewing company.

The brewing company takes the position that beer is a recognized and legitimate subject of interstate commerce, that the consignment in controversy was seized while in transit from one state to another and before delivery at destination by the carrier, and consequently that it was not subject to the laws of Kansas enacted pursuant to its policy respecting traffic in intoxicating liquors. The state meets this contention by invoking the provisions of the act of congress of March 1, 1913, called the Webb-Kenyon act, from the names of its sponsors in congress, Senator Kenyon, of Iowa, and Representative Webb, of North Carolina. The act reads as follows:

"An Act Divesting intoxicating liquors of their interstate character in certain cases.

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the shipment or transportation, in any manner or by any means whatsoever, of any spirituous, vinous, malted, fermented, or other intoxicating liquor of any kind, from one State, Territory, or District of the United States, or place noncontiguous to but subject to the jurisdiction thereof, into any other State, Territory, or District of the United States, or place noncontiguous to but subject to the jurisdiction thereof, or from any foreign country into any State, Territory, or District of the United States, or place noncontiguous to but subject to the jurisdiction thereof, which said spirituous, vinous, malted, fermented, or other intoxicating liquor is intended, by any person interested therein, to be received, possessed, sold, or in any manner used, either in the original package or otherwise, in violation of any law of such State, Territory, or Dis-

trict of the United States, or place noncontiguous to but subject to the jurisdiction thereof, is hereby prohibited." (Part 1, 37 U. S. Statutes at Large, ch. 90, p. 699.)

The statutes of this state prohibit the sale of intoxicating liquors, except that certain wholesale druggists may sell alcohol in specified quantities to certain registered pharmacists for medicinal, mechanical, and scientific purposes. Provision is made for the seizure and condemnation of intoxicating liquors kept or used in violation of law. These statutes supplement a provision of the constitution of the state intended to suppress traffic in intoxicating liquors and express the settled conviction of the people of the state, formed after long experience in dealing with that subject.

The town of Carona is situated in the mining district of the state, which is inhabited by a large population of foreign extraction not yet domesticated to our institutions and not in sympathy with the liquor law. The law is difficult of enforcement there when undermined by foreign brewing companies unless the officers are able to seize and procure condemnation of shipments of liquor for unlawful purposes in bulk before they are broken up, distributed among jointkeepers and bootleggers, and commingled with the general property of the state. The Wilson law, which permitted shipments of liquor to retain their interstate character until delivery to the consignee, or at least until carriage proper was completed, left the state law subject to evasions embarrassing to its administration. The act of March 1, 1913, by suffering the police power of the state to attach to interstate shipments of liquor intended for unlawful uses before delivery exactly meets the condition presented by this record, and permits the state effectually to enforce a policy deemed highly essential to its welfare.

It is indeed true that the supreme court of the United States has many times declared that intoxicat-

ing liquors are recognized and legitimate subjects of interstate commerce. This declaration, however, has always been made in accordance with existing law. Congress has now spoken upon the subject in such a way that the declaration must be qualified. Intoxicating liquors are recognized and legitimate subjects of interstate commerce only when not intended for sale or use in violation of the laws of the destination state. The result is that the fact that the consignment in controversy was still in transit from the state of its origin did not protect it from condemnation consequent upon the finding of the court that it was intended for unlawful use in Kansas.

The only remaining question is whether or not it was competent for congress to enact the statute, which, it may be recalled, became a law in opposition to the veto of President Taft, who based his disapproval on constitutional grounds.

There is no declaration in the constitution of the United States that interstate commerce shall be free. Congress is given power to regulate such commerce, that is, to prescribe the rules by which it shall be governed and the conditions upon which it shall be conducted, and, as said by the supreme court of the United States, "The framers of the Constitution never intended that the legislative power of the nation should find itself incapable of disposing of a subject matter specifically committed to its charge." (*In re Rahrer*, 140 U. S. 545, 562.)

Intoxicating liquors belong to a class of commodities which may be made contraband at the will of congress. Congress might if it chose altogether prohibit the transportation of such liquors in interstate commerce by placing them in the same category with lottery tickets, obscene literature, adulterated foods and drugs, diseased animals, and women and girls going from one state to another for immoral purposes. In holding that state legislation prohibiting the manufacture of

intoxicating liquors to be sold for general use as a beverage did not necessarily infringe any right, privilege, or immunity secured by the constitution of the United States the supreme court of the United States said:

"We can not shut out of view the fact, within the knowledge of all, that the public health, that public morals, and the public safety, may be endangered by the general use of intoxicating drinks; nor the fact, established by statistics accessible to every one, that the idleness, disorder, pauperism, and crime existing in the country are, in some degree at least, traceable to this evil." (*Mugler v. Kansas,* 123 U. S. 623, 662.)

The plenary power of congress includes the lesser power to permit interstate commerce in intoxicating liquors so far and under such conditions as congress may determine.

Before the enactment of the Wilson law intoxicating liquors retained their interstate character until after sale in the original package of importation. That law permitted such commodities to retain their interstate character until transportation was completed, but divested them of that character with the performance of that act. In passing on the constitutionality of the Wilson law the supreme court of the United States said:

"No reason is perceived why, if Congress chooses to provide that certain designated subjects of interstate commerce shall be governed by a rule which divests them of that character at an earlier period of time than would otherwise be the case, it is not within its competency to do so." (*In re Rahrer,* 140 U. S. 545, 562.)

In essence and effect, and as its title indicates, the Webb-Kenyon law divests intoxicating liquors of their interstate character still earlier in the course of transportation than did the Wilson law and exposes them to state regulations adopted pursuant to the police power immediately upon their entrance into the state to which they may be consigned.

By the act in question congress delegated none of its own power over interstate commerce to the states. Congress and congress alone prescribed the condition under which interstate commerce in intoxicating liquors may be carried on.

The laws of the various states regulating the liquor traffic are enacted pursuant to the police power. This power was not granted to the states by the constitution of the United States and can not be lawfully surrendered by them. They did, however, surrender to congress power over interstate commerce, and they can not make rules for interstate commerce under the authority of the police power. Therefore, interstate movements of intoxicating liquors are not subject to the police power of the states unless congress so wills. By nonaction congress is presumed to will that such movements shall be free, and state regulations, whatever they may be, operate accordingly. When congress by virtue of its power to regulate commerce attaches to interstate movements of intoxicating liquors the special condition that they shall not be comsummated for the purpose of violating the laws of the destination states, the regulation is the regulation of congress. Nothing is delegated to the states, and the state laws operate as before; that is, subject to the paramount will of congress, albeit they extend to articles which were exempt from their operation before the adoption of the special rule.

Substantially the same considerations dispose of the suggestion that by the law in question congress did not prescribe a uniform rule for the transportation of intoxicating liquors in interstate commerce, but left such transportation subject to the conflicting regulations of forty-eight states.

Nine states of the Union are "dry." Only a few have more "wet" than "dry" territory. Approximately seventy per cent of the area of the United States is dry, and a majority of all the people of the United States

live in dry territory. Every state has laws of some kind relating to the liquor traffic. These various state regulations are social facts cognizable by congress the same as facts of any other kind. In view of these facts congress has deemed it important to make a special regulation of interstate commerce, and in its wisdom has in effect declared that interstate commerce in intoxicating liquor shall not be employed as an instrument to violate the liquor law of any state. The condition thus imposed is one imposed by congress, and the condition is identical for every state in the Union. If congress provided a rule which would operate, for example, one way in one prohibition state and another way in another state having the same prohibition law, it might be said that the rule did not operate uniformly. Here, however, the basis of classification is the existence of a state law regulating the liquor traffic. Given that fact, and an intention to violate such law, and the condition of the law attaches. The condition is precisely the same for all states belonging to the same class, and consequently the law is uniform in its operation.

It can scarcely be said that congress must wait until all the states have an identical law before it has the constitutional power to attach a condition to interstate commerce like that contained in the Webb-Kenyon act. It is for congress and not for the courts to determine when social conditions in the territory subject to its jurisdiction are such as to call for an exercise of its power over interstate commerce and what the regulation shall be, and it is conceivable that if one state in the Union should have state-wide prohibition congress might deem it advisable to divest intoxicating liquors intended to be used unlawfully in such state of their interstate character. It may be observed in this connection that the constitution of the United States does not require uniform laws respecting interstate commerce, as it does respecting the subjects of duties, im-

posts, and excises, naturalization, and bankruptcy. The only express restriction on the regulation of interstate commerce by congress, looking to uniformity, is that contained in the fifth subdivision of section 9 of article 1 of the constitution, which relates to preference to ports of one state over those of another. Even when uniformity is expressly commanded it is not necessary that the practical results of the operation of a law of congress shall be perfectly uniform. Thus the bankruptcy law of 1898 was held to be uniform, although it allowed exemptions to bankrupts according to the diverse provisions of the laws of the respective states. (*Hanover National Bank v. Moyses,* 186 U. S. 181.) But, as already observed, the Webb-Kenyon act is uniform in its operation according to the legal signification of that term.

Being of the opinion that the act in question is constitutional and that it governs the facts of the present controversy, it is the duty of the court to apply it, and the judgment of the district court is affirmed.