No. 19,984.

THE STATE OF KANSAS, *Appellee and Appellant,* v. THE MIS-SOURI PACIFIC RAILWAY COMPANY, *Appellant and Appellee.*

SYLLABUS BY THE COURT.

1. INTOXICATING LIQUORS—*The "Webb-Kenyon Act"—Constitutional.* The Webb-Kenyon act (Part 1, 37 U. S. Stat. at Large, ch. 90, p. 699). removing the interstate character and protection from intoxicating liquor shipped into a state for the purpose of use in violation of its laws, is a valid exercise of the commerce power vested in congress by the constitution.

2. SAME. In passing a bill by the senate upon reconsideration after a veto it is not essential that two-thirds of all the senators vote therefor but it is sufficient if two-thirds of a quorum support such bill.

3. SAME. The act in question is not void as a delegation of power over interstate commerce but is a legitimate exercise of such power.

4. SAME. The constitution was not framed and adopted for the ·special protection of those who violate statutes but for the good of the entire citizenship, and is to be construed with due regard for inevitable changes in social conditions and the advancement made in respect to the health, morals and welfare of the people.

5. SAME. The spirit of the constitution does not oppose but favors congressional action which makes for the promotion of obedience to the laws of the several states.

6. SAME — *"Mahin Act" — Constitutional and Valid.* The Mahin act (Laws 1913, ch. 248) is not void as an attempt to regulate interstate commerce, but, complementary to the Webb-Kenyon act, is a valid enactment concerning the bringing into the state of intoxicating liquor for unlawful use here.

7. SAME. The title of the act is sufficient.

8. SAME—*Presumption that Bill was Read by Sections.* The senate journal does not affirmatively show that the bill was not read by sections on its final passage and the presumption is that the requirements of section 15 of article 2 of the constitution were observed.

9. SAME—*Filing of Statements by Consignee with County Clerk.* The requirements concerning statements in writing to be made or taken and filed with the county clerk do not violate the provisions of sections 15 and 20 of the interstate commerce act, as amended.

39—96 KAN.

10. SAME—*Delivery of Liquor to Minors—No Application Here.* Provisions of the act relating to shipments within the state and the delivery of liquor to minors do not affect this prosecution and can not be invoked for the purpose of building up the defense that the statute is unconstitutional.

11. SAME—*Railroad Agent May Refuse Delivery of Liquors.* The authority given the agent to refuse delivery of a shipment of intoxicating liquor when intended for unlawful use does not confer upon him judicial power.

12. SAME — *"Mahin Act" Legitimate Subject of Punitive Legislation.* Bringing into the state property to be used in violation of its laws is a legitimate subject of punitive legislation akin to that of bringing in stolen property.

13. SAME—*Information—Each Count Charged a Public Offense.* The information in twelve counts charged the unlawful bringing of intoxicating liquor into the state, in twelve others its unlawful delivery here, and in the twenty-fifth both a bringing in and a delivery. *Held,* that each count charged an offense and it was error to exclude evidence under any of such counts.

14. SAME—*Statements Filed with County Clerk—Pleas of Guilty by Consignee—Competent Evidence.* The statements of the shipments made and filed by the carrier with the county clerk were competent evidence, as were also the dockets of a justice of the peace showing pleas of guilty by such consignees to the charges of violating the prohibitory law.

15. SAME—*Certified Copies from Internal Revenue Office—Competent Evidence.* Certified copies of records in the office of the United States internal revenue collector for this district showing that from July, 1912, to July, 1913, the consignees held receipts for taxes paid as wholesale liquor dealers were competent and their exclusion was error.

16. SAME—*Fee of $25 to County Attorney on Each Conviction Valid.* The county attorney is entitled to have taxed as costs a fee of $25 on each count covered by the conviction and the direction to the clerk to omit such fee from the taxation of costs was error.

Appeal from Cherokee district court; EDWARD E. SAPP, judge. Opinion filed November 6, 1915. Affirmed in part and reversed in part.

*S. M. Brewster,* attorney-general, and *F. W. Boss,* county attorney, for the plaintiff.

*W. P. Waggener, J. M. Challiss,* both of Atchison, and *Al F. Williams,* of Columbus, for the defendant.

The opinion of the court was delivered by

WEST, J.: The defendant was prosecuted for violating the Mahin liquor law (Laws 1913, ch. 248).

The information contained twelve counts charging the unlawful bringing into the state of certain intoxicating liquor for the purpose of delivering it to one interested therein who intended to use it in violation of the prohibitory law, the defendant knowing such intention. The next twelve counts charged deliveries of such liquors to such persons for like purpose with like knowledge on the part of the defendant, and the twenty-fifth count charged both such bringing and delivery. The trial court sustained an objection to testimony under counts thirteen to twenty-five, inclusive, from which ruling the state, having reserved a question, appeals. The defendant was convicted on the first twelve counts, and from the judgment thereon appeals and assigns as grounds for reversal numerous reasons, each of which will now be considered.

The title chosen by the legislature is:

"An act regulating the shipment of intoxicating liquor into the state or between points within the state, regulating the delivery of such liquor, providing for the filing of statements with the county clerk showing such shipments and providing for the fees of such county clerk for filing such statements, and prescribing penalties for the violation of the provisions of this act, and repealing all acts and parts of acts in conflict herewith."

It would have been amply sufficient and much more perspicuous to call it "An act relating to the shipment of intoxicating liquor," for this is what the title means and all it means. Hence the contention that section 16 of article 2 of the constitution requiring the subject of an act to be clearly expressed in the title was violated is without merit. (*Division of Howard Co.*, 15 Kan. 194; *In re Greer*, 58 Kan. 268, 48 Pac. 950; *The State v. Everhardy*, 75 Kan. 851, 90 Pac. 276; *The State v. Prather*, 84 Kan. 169, 112 Pac. 829.)

Because the senate journal does not show that the bill was read by sections after amendment in the house, it is argued that the act is void by virtue of section 15 of article 2 of the constitution, requiring that the reading of bills by sections on final passage shall in no case be dispensed with. But as the senate journal does not show that it was not thus read, and is silent on that matter, the presumption is that the constitu-

tional requirement was observed. (*Weyand v. Stover, Treas.,* 35 Kan. 545, 553, 11 Pac. 355.)

It is suggested that the act confers judicial power on agents to hear and decide the question of unlawful purpose on the part of the consignee. This is based on the provision of section 4 that if the agent taking the statement of the person to whom the liquor is delivered that it is for his own use knows such statement to be false he may refuse to deliver the liquor. This is simply a practical means by which the agent may prevent liability himself and also hinder the consignee from making a spectacle of him by forcing upon him a statement palpably false. The agent acts as an individual and not as a judicial tribunal in taking the statement, and is not by the section in question clothed with judicial power.

The act prohibits the delivery of liquor by a carrier to a minor, and this is assigned as a ground of invalidity. But as no minor is involved in this transaction the defendant is not affected or harmed by this provision and under the familiar rule can not invoke it as a defense. (*The State v. Smiley,* 65 Kan. 240, 69 Pac. 199, and cases cited; *The State v. Railway Co.,* 76 Kan. 467, 490, 92 Pac. 606.)

It is insisted that the criminality of the carrier can not be based on the unknown intention of the consignee to use the liquor unlawfully. But if the act be otherwise valid, no reason is apparent why the legislature may not punish the carrier who assists in violating the prohibitory law by knowingly bringing into the state for the purpose of delivery or knowingly delivering liquor to one who intends to use it unlawfully. Knowledge and participation may well in law as in ethics render him *particeps criminis* with the guilty receiver.

The point is sought to be made that the evidence was insufficient to show knowledge, but it was such as to convince any fair-minded person that a carrier who repeatedly delivers liquor in lots of from 10,000 to 30,000 pounds to known violators of the prohibitory law must be plethorically overstocked with ignorance not to know that such consignments are for other than the personal use of those receiving them. The jury reached the only possible sensible conclusion. This was approved by the trial court and there the matter must rest.

The statements of the shipments filed with the county clerk

are said to have been incompetent evidence for the reason that they are required to be made by the carrier, and to use them against him is to make him a witness against himself. But he was not required to deliver or report such shipments if he had reason to believe they were intended for unlawful use, until he secured a written statement from the consignee that they were for his own use, and with this condition he can have no just complaint.

Dockets of justice courts showing violations of the law by the consignees were introduced, and the defendant complains that pleas of guilty long prior to the deliveries in question do not prove or tend to prove that the persons entering such pleas intended to violate the Mahin act after it should become a law. But together with the other evidence they were not only competent but significant and it was not error to receive them.

That the first twelve counts stated no offense because they charged only shipments into the state and not deliveries for unlawful purposes is also urged. As a matter of state legislation there is no reason why the unlawful bringing of liquor into the state can not be constituted a crime, as was the bringing in of stolen property long years ago. The argument that an interstate shipment includes delivery is of necessity without force if the shipment be not interstate in character, and assuming for the moment that those here involved were not, each of the counts referred to stated an offense. The point that the title of the act mentions shipment only and not delivery, while the body of the act requires a statement to be taken only on delivery, loses sight of the fact that the statute is in the disjunctive—shipment or delivery—and of course a statement from the consignee could not be had until the shipment was delivered. The suggestion that the word "shipment" is used in the title in its generic sense and includes delivery is correct, but this does not preclude division and separation into specific constituent offenses in the body of the act.

Counsel for the defendant by able and elaborate argument and brief have forcibly sought to maintain that the Mahin act is void as an attempt to regulate interstate commerce, that its interstate features can not be separated from its state features so as to leave a valid statute, and that it plainly

violates the interstate commerce act by requiring records of interstate shipments. It does unmistakably purport and undertake to make unlawful not only the delivery but the shipment into the state of a commodity heretofore held to be a legitimate subject of interstate commerce whose shipment included its delivery after arrival here. Just as plainly and clearly does it require records of such shipments to be taken by the carrier and filed with the county clerk, who is to permit their inspection by all persons so desiring. While, ordinarily, a common carrier may be compelled to accept and transport such a commodity in accordance with the required secrecy enjoined by the federal statute, this act not only relieves the carrier from liability for refusal to accept and transport, but makes him criminally liable for handling a shipment when there is reasonable ground for believing that it contains intoxicating liquor, without requiring and receiving a statement from the consignee that it is intended for his own use, the falsity of which statement renders its maker liable to fine and imprisonment. It is apparent that this legislation marks a departure from any possible path formerly marked out by federal enactment and decision, and unless changes have been made therein which warrant such departure the attempt must of necessity fail as beyond the power of a state legislature.

It is needless from the standpoint of the defendant to inquire whether the local features can be so separated from the national features as to leave a valid enactment for the reason that the only counts on which conviction was had charged an unlawful transportation into the state. Section 2, requiring the carrier to file with the county clerk a statement in writing setting forth the date, name and address of the consignee, place of delivery and person to whom delivered, and the kind and amount of the liquor, and section 4, that in case of reasonable doubt the carrier shall take from the consignee a written statement that the liquor is for his own use, and file such statement with the county clerk, together with the clause of section 2 that the county clerk shall permit all persons so desiring to inspect the statements just mentioned, are regarded by the defendant as in violation of amended sections 15 and 20 of the interstate commerce act. (Part 1, 34 U. S. Stat. at Large, ch.

3591, §§ 4, 7, pp. 589, 593; Part 1, 36 U. S. Stat. at Large, ch. 309, §§ 12, 14, pp. 551, 555.)

It is asserted that "these records and accounts so to be kept under the Mahin act are applicable to both legitimate and illegitimate movements in interstate commerce," and that congress has fully acted upon the subject by forbidding the delivery of liquor to any other person than the consignee unless upon his written order for the collection of the purchase price thereof, or the transportation of liquor unless labeled on the outside so as to show the name of the consignee and the nature and quantity of the contents. (Part 1, 35 U. S. Stat. at Large, ch. 321, §§ 238-240, p. 1136, 1137.) Also that this provision violates section 15 of the interstate commerce act. The amendment of June 18, 1910, does provide that it shall be unlawful to disclose or permit to be acquired by any person or corporation other than the shipper or consignee, without their consent, any information concerning the nature, kind, quantity, destination, consignee or routing of any property tendered or delivered for interstate shipment, "which information may be used to the detriment or prejudice of such shipper or consignee or which may improperly disclose his business transactions to a competitor" (Part 1, 36 U. S. Stat. at Large, ch. 309, § 12, p. 553), except in obedience to certain process or under conditions set forth in the amendment. The provision of section 20, as amended, after requiring certain reports by common carriers and providing that the commission may prescribe the forms of any and all accounts, records and memoranda to be kept, specifies that "it shall be unlawful for such carriers to keep any other accounts, records or memoranda than those prescribed or approved by the commission." (Part 1, 34 U. S. Stat. at Large, ch. 3591, § 7, p. 594.)

Section 9 of the Mahin act provides that, "This act shall be construed in harmony with all federal statutes relating to interstate commerce in intoxicating liquors." Attention is called to an opinion by Mr. Justice Dawson when attorney-general of the state, advising county clerks that the provision requiring records is broader than the terms of section 15 of the interstate commerce act as amended, and advising that the filed statements be preserved for the inspection of public officials charged with the duty of enforcing the law and the

auditing officers of the carriers only. The exigency of the situation arising immediately upon the passage of the Mahin act presented many pressing questions concerning the operation thereof, and this circular letter resulted from such examination and investigation as the limited time and manifold duties of the attorney-general permitted, and was an administrative interpretation to avoid threatened litigation. Having now had time for thorough investigation and consideration, and the advantage of the briefs and arguments of counsel, we are impelled to the conclusion that the alleged conflict between these provisions of the Mahin act and the interstate commerce law might doubtless be a serious question were the commodity involved in this transaction still a legitimate subject of interstate commerce, but, as will presently appear, it no longer retains that character.

We come now to the chief cornerstone of the defendant's argument—that the act is void because an attempt to regulate interstate commerce.

The validity of the Mahin act depends upon the constitutionality of the Webb-Kenyon act. (Part 1, 37 U. S. Stat. at Large, ch. 90, p. 699.) Three grounds of the latter's invalidity are assigned: that it was not passed by a constitutional majority of the senate; that congress can not class intoxicating liquor with lottery tickets, diseased meat and other things intrinsically vicious or deleterious, and that the act is void as an attempted delegation of commerce power to the states. Of these in their order.

Section 7 of article 1 of the federal constitution requires that a vetoed bill, after passage by the house in which it originated shall be sent to the other house, "by which it shall likewise be reconsidered, and if approved by two-thirds of that house, it shall become a law." Section 3 provides that in case of impeachment no person shall be convicted "without the concurrence of two-thirds of the members present." The language of section 5 is that a majority of each house shall constitute a quorum to do business, and that each house may determine the rules of its proceedings and shall keep a journal of its proceedings, "and the yeas and nays of the members of either house on any question shall, at the desire of one-fifth of those present, be entered on the journal." *The United*

. The State v. Railway Co.

*States v. Alice Weil et al.,* 29 Ct. Cl. 523, and *State v. Gould,*
31 Minn. 189, 17 N. W. 276, are cited. In the Weil case this
question was only incidental, and while in the discussion of it
the court referred to the similarity of language found in the
New York constitution adopted before the federal convention,
it was also said, touching the meaning of the two-thirds
provision:

"What this decisive majority may be within the intent of the Con-
stitution has been, and may again be, a matter of grave consideration.
"On the 7th July, 1856, the Senate of the United States decided, by
a vote of 34 to 7, that two-thirds of a quorum only were requisite to
pass a bill over the President's veto, and not two-thirds of the whole
Senate. (Paschal, note 68.) And it is understood that this has been,
and still is, the legislative construction of the words 'two-thirds of the
House.'
"The Constitution declares that 'a majority of each House shall con-
stitute a quorum.' Therefore it will require only two-thirds of the
majority of each House to enact a law, notwithstanding the objections
of the President. . . . Here, however, it should be said that this
construction of the two-thirds clause has never been brought to the test
of judicial determination." (pp. 539, 540.)

The Gould case is the only other authority cited in support
of the view contended for. In *Railway Co. v. Simons,* 75 Kan.
130, 88 Pac. 551, in a specially concurring opinion by Mr.
Justice Mason, in which Mr. Justice Porter joined, it was said:

"Where a two-thirds vote (or other proportion) of a legislative body
is prescribed as necessary for any purpose, two-thirds of those who are
present and constitute a quorum is understood, unless special terms are
employed clearly indicating a different intention. (Cooley's Const. Limit.
7th ed., 201, note 2; *Cotton Mills v. Commissioners,* 108 N. Car. 678, 13
S. E. 271; *Green v. Weller et al.,* 32 Miss. 650; *Warnock v. Lafayette,*
4 La. Ann. 419.) This is the legislative construction placed upon the
provision of the federal constitution that a bill shall become a law not-
withstanding the president's veto, 'if approved by two-thirds of' each
house. (U. S. Const., art. 1, § 9. See *The United States v. Alice Weil
et al.,* 29 Ct. of Cl. 523, 539.) A contrary view is announced in *State
v. Gould,* 31 Minn. 189, 17 N. W. 276." (p. 139.)

It was further pointed out that when two-thirds of the
entire membership must unite, such intention is usually in-
dicated by a provision requiring two-thirds of all the members
elected. Judge Cooley, in his work on Constitutional Limi-
tations, 6th ed., p. 168, said:

"A simple majority of a quorum is sufficient, unless the constitution
establishes some other rule; and where, by the constitution, a two-

thirds or three-fourths vote is made essential to the passage of any particular class of bills, two-thirds or three-fourths of a quorum will be understood, unless the terms employed clearly indicate that this proportion of all the members, or of all those elected, is intended."

*The State v. McBride,* 4 Mo. 303, is a well-reasoned decision sustaining the position taken by Judge Cooley. (See, also, *United States v. Ballin,* 144 U. S. 1, 5.) It must be held, therefore, in accordance with these authorities and the rule of the senate itself that the act received the necessary support after the president's veto.

Next, as to the power of congress to class intoxicating liquor as a commodity fraught with danger or damage and therefore to be excluded from interstate commerce, it is said that, unlike statutes relating to lottery tickets, diseased meats and other articles which have been denied the privilege of interstate commerce, this act denies such privileges to intoxicating liquors only in certain local territory dependent entirely upon state legislation, thus leaving it recognized as a legitimate article of interstate commerce when shipped under certain conditions and circumstances and entirely illegitimate under other circumstances and conditions. It is argued that this amounts to a delegation to the legislatures of various states of power to control and therefore to regulate interstate commerce and that such delegation is not within the legislative province of congress. We do not regard the Webb-Kenyon act as a delegation of congressional power. The contrary was expressly held in *The State v. Brewery Co.,* 92 Kan. 212, 139 Pac. 1169. Hence it is not necessary to enter upon a discussion of the validity of such an attempt had it been made, if indeed it should be claimed that such power can be delegated, no such claim being made in this case.

The title is:

"An act divesting intoxicating liquors of their interstate character in certain cases."

The brief statute itself simply provides, for the purposes of this case, "That the shipment or transportation in any manner or by any means whatsoever, of any . . . intoxicating liquor of any kind, from one state . . . into any other state . . . which . . . intoxicating liquor is intended, by any person interested therein, to be received, possessed,

sold, or in any manner used, either in the original package or otherwise, in violation of any law of such state," (Part 1, 37 U. S. Stat. at Large, ch. 90, p. 699) shall be unlawful. Congress has therefore undertaken to divest of its interstate character all intoxicating liquor shipped into a state to be used for an unlawful purpose—that is, for a purpose made unlawful by any law of such state. When the law of a given state makes it a crime to sell intoxicating liquor congress intends that any liquor shipped in for the purpose of violating such statute shall be divested of its interstate character and that all the protection incident to such character shall be removed from it.

This brings us to the vital question on which hang all the law of the prophets of this conviction, namely: whether the power granted congress by the constitution to regulate interstate commerce includes the authority thus to divest a given commodity of its interstate character.

In considering this most important and far-reaching problem it is one thing to regard its solution as a logical deduction to be drawn mechanically from the language of the constitution and another thing to account this a serious, deliberate attempt by the lawmaking power of the nation to obey the very spirit of the constitution itself, framed for the professed purpose of insuring domestic tranquillity and promoting the general welfare. The citizen who, driving close to the brink, passes the danger line and finds himself in the wrecked condition brought about by transgressing the law, will search with eagerness for some solace and protection in the great fundamental charter whence the body which enacted the law derived its power. Under these circumstances the searcher asserts with vehemence the rights of the individual as against the assumed corrective power of the state itself, and the immortal blessings of personal liberty find no greater champions or more eloquent eulogists than those who are accused of violating statutes prescribed for the government of their conduct. It may be said, however, that constitutions are not framed and adopted for the special benefit of those who disregard or stretch to the breaking enactments intended for the enhancement of the public peace and welfare, but for the good of the citizenship at large, and the protection of higher things, the things of real value to humanity which make life worth living. Civil con-

ditions can not remain stationary, and unless they retrograde they must advance, and when the lawmaking power of the nation, upon serious thought and careful deliberation, enacts a statute manifestly and unmistakably intended to promote the public health and morals and happiness it must be presumed, until the contrary be clearly shown, that it acted within its lawful province and power. Let us see, then, whether liquors shipped into a state for the purpose of violating its statutes can be divested of their interstate character in the exercise by congress of its power to regulate interstate commerce.

That clear-seeing statesman and publicist, James Bryce, upon remarking that some one had observed that the American government and constitution are based on the theology of Calvin and philosophy of Hobbs, said:

"This at least is true, that there is a hearty Puritanism in the view of human nature which pervades the instrument of 1787. It is the work of men who believed in original sin, and were resolved to leave open for transgressors no door which they could possibly shut." (1 The American Commonwealth, Bryce, 299.)

Dillon, in his lectures on The Laws and Jurisprudence of England and America, said that the absolutely unique feature of this republic is its written constitutions whereby the people, "by an act of unprecedented wisdom," have in order to establish justice, to promote the general welfare and secure the blessings of liberty to themselves and their posterity, "protected themselves against themselves." (p. 196.) Willoughby, in his work On the Constitution, says:

"In construing the Constitution the very proper and indeed absolutely necessary principle has been followed that that instrument was intended to endure for all time and that its grants of power are, therefore, to be interpreted as applicable to new conditions as they arise. By this is not meant, however, that these new conditions shall in any case justify the exercise of a power not granted, or create a limitation not imposed by the Constitution, but that the powers which are granted shall, if possible, be made applicable to these new conditions." (Vol. 1, § 26.)

As said by a brilliant and well-known member of the legal profession:

"The constitution our fathers made had the marching quality in it. . . . It has been supposed by some students of our national history that a written constitution is an inert mass of tabulated provisions. The supposition is not correct; for the national constitution,

under the guidance of our great court of last resort, has grown and developed, not, perhaps, like an unwritten one, but still keeping abreast with the demands of 'progressive history.' This does not mean that a written constitution grows by being violated whenever its provisions stand in the way of national progress; but it does mean that our constitution was, by the enlightened foresight of its framers, made to be an intelligent guide and chart, not a mere list of obstacles." (George R. Peck, Reports of American Bar Association, 1900, vol. 23, pp. 256, 275.)

"We now see the great end which they proposed to accomplish. It was to frame, for the consideration of their constituents, one federal and national constitution—a constitution that would produce the advantages of good, and prevent the inconveniences of bad government—a constitution, whose beneficence and energy would pervade the whole union, and bind and embrace the interests of every part—a constitution that would ensure peace, freedom, and happiness, to the states and people of America." (1 Wilson's Works, Andrews, p. 542.)

"Although Congress can not authorize a state to legislate, it may adopt state legislation; it may divest designated articles of their interstate commerce character and subject them to the operation of state laws." (Notes on United States Constitution, Sutherland, p. 79.)

"That the power to regulate includes the power to prohibit the interstate transportation of at least certain classes of commodities has been placed beyond question by the decision of the court in *Champion v. Ames*, 188 U. S. 321." (2 Willoughby on the Constitution, § 347.)

A writer of great legal experience and ability, in speaking of the power of congress to regulate commerce, said:

"Having ascertained, then, what commerce is, and what are some of its elements, which may be the subject of the action of Congress, or of the attempted action of the States, we next come to consider what it is to 'regulate' commerce. . . . Commerce being intercourse and traffic between people, to regulate it is to prescribe rules by which it shall be conducted." (Miller on the Constitution of the United States, p. 449.)

In *Gloucester Ferry Co. v. Pennsylvania*, 114 U. S. 196, Mr. Justice Field, in delivering the unanimous opinion of the court, said:

"Commerce among the States consists of intercourse and traffic between their citizens, and includes the transportation of persons and property, and the navigation of public waters for that purpose, as well as the purchase, sale and exchange of commodities. The power to regulate that commerce, as well as commerce with foreign nations, vested in Congress, is the power to prescribe the rules by which it shall be governed, that is, the conditions upon which it shall be conducted; to determine when it shall be free and when subject to duties or other exactions. The power also embraces within its control all the instru-

mentalities by which that commerce may be carried on, and the means by which it may be aided and encouraged." (p. 203.)

At page 215 the court quoted with approval from Judge Cooley to the effect that congress may descend to the most minute directions of interstate commerce and may establish police regulations as well as the states, "confining their operations to the subjects over which it is given control by the constitution" (Cooley's Constitutional Limitations, 4th ed., p. 732.)

In *United States v. Gettysburg Electric R'y*, 160 U. S. 668, the act of August 1, 1888, "An Act to authorize condemnation of land for sites of public buildings and for other purposes" (25 U. S. Stat. at Large, ch. 728, p. 357), and a later act authorizing the expenditure of funds for the erection of monuments and tablets at Gettysburg, and a later joint resolution authorizing the secretary of war to purchase lands for that purpose, were under consideration, the important question being whether the use to which the land was to be put was one for which the government could condemn land. Mr. Justice Peckham, in announcing the unanimous opinion of the court, said:

"In examining an act of congress, it has been frequently said that every intendment is in favor of its constitutionality. Such act is presumed to be valid unless its invalidity is plain and apparent. No presumption of invalidity can be indulged in. It must be shown clearly and unmistakably. This rule has been stated and followed by this court from the foundation of the government. . . . Any act of congress which plainly and directly tends to enhance the respect and love of the citizen for the institutions of his country, and to quicken and strengthen his motives to defend them, and which is germane to, and intimately connected with, and appropriate to the exercise of some one or all of the powers granted by congress, must be valid." (pp. 680, 681.)

Again:

"Can it not erect the monuments provided for by these acts of congress, or even take possession of the field of battle, in the name and for the benefit of all the citizens of the country, for the present and for the future? Such a use seems necessarily not only a public use, but one so closely connected with the welfare of the republic itself as to be within the powers granted congress by the constitution for the purpose of protecting and preserving the whole country. . . . No narrow view of the character of this proposed use should be taken. Its national character and importance, we think, are plain. The power to condemn for this purpose need not be plainly and unmistakably deduced from any one

of the particularly specified powers.  Any number of those powers may be grouped together, and an inference from them all may be drawn that the power claimed has been conferred."  (pp. 682, 683.)

While the beneficent purposes of the Webb-Kenyon act are of an entirely different character from those thus eloquently reviewed, they touch as clearly and as deeply the welfare of the country by way of the protection of its manhood and woman-hood as those in the case referred to, for it is of as much national importance to make men sober as to make them patriotic.  In the case of *In re Rahrer,* 140 U. S. 545, holding constitutional the Wilson bill which removed from interstate shipments of liquor the former protection of the right of sale in the original package after reaching the state of importa-tion, it was pointed out that the constitution does not provide that interstate commerce shall be free but by the commerce clause left it free except as restrained by congress.  Reference was made (p. 557) to the language used in the *License Cases,* 46 U. S. 504, 599, to the effect that if a commodity does not from its nature belong to commerce, or if its condition, from putrescence or other cause, be such that when it is about to enter the state it no longer belongs to commerce or is not a commercial article, then the state may exclude its introduction. It was further declared that by the adoption of the constitution the ability of the several states to follow their own will was extinguished and that of the general government substituted.

"But this furnishes no support to the position that Congress could not, in the exercise of the discretion reposed in it, concluding that the com-mon interests did not require entire freedom in the traffic in ardent spirits, enact the law in question.  In so doing Congress has not attempted to delegate the power to regulate commerce, or to exercise any power reserved to the States or to grant a power not possessed by the States, or to adopt state laws.  It has taken its own course and made its own regulation, applying to these subjects of interstate commerce one com-mon rule, whose uniformity is not affected by variations in state laws in dealing with such property. . . .  The power to regulate is solely in the general government, and it is an essential part of that regulation to prescribe the regular means for accomplishing the introduction and in-corporation of articles into and with the mass of property in the country or State.  *Brown v. Maryland,* 25 U. S. (12 Wheat.) 448.

"No reason is perceived why, if Congress chooses to provide that cer-tain designated subjects of interstate commerce shall be governed by a rule which divests them of that character at an earlier period of time than would otherwise be the case, it is not within its competency to do so." (pp. 561, 562.)

Again:

"Congress did not use terms of permission to the State to act, but simply removed an impediment to the enforcement of the state laws in respect to imported packages in their original condition, created by the absence of a specific utterance on its part. It imparted no power to the State not then possessed, but allowed imported property to fall at once upon arrival within the local jurisdiction." (p. 564.)

This language seems almost prophetic of a further step than that of the Wilson bill, which should ere long be taken by congress in respect to the interstate character of intoxicating liquor. Before the enactment of the Wilson bill it was settled law that the state could not prohibit the sale within its borders of imported liquor in its original package, for the reason that the interstate character was deemed to be retained until separated from such package. Congress, therefore, removed the interstate character to the extent thus indicated by the passage of the Wilson bill, and by the very terms of the Webb-Kenyon bill professes and assumes to remove the interstate character of liquor shipped into a state for the purpose of violating its laws. If one be within the constitutional grant of power to congress it is difficult in the extreme to see why the other is not likewise within such grant. In *Delamater v. South Dakota,* 205 U. S. 93, the statute making it a misdemeanor to take orders within the state for the purchase of liquors was upheld as not in conflict with the exclusive power of congress over interstate commerce. Mr. Justice White, in the opinion, after referring to the effect accomplished by the passage of the Wilson bill, said:

"The propostion relied upon, therefore, when considered in the light of the Wilson act, reduces itself to this: Albeit the State of South Dakota had power within its territory to prevent the sale of intoxicating liquors, even when shipped into that State from other States, yet South Dakota was wanting in authority to prevent or regulate the carrying on within its borders of the business of soliciting proposals for the purchase of liquors, because the proposals were to be consummated outside of the State, and the liquors to which they related were also outside the State. This, however, but comes to this, that the power existed to prevent sales of liquor, even when brought in from without the State, and yet there was no authority to prevent or regulate the carrying on the accessory business of soliciting orders within the State. Aside, however, from the anomalous situation to which the proposition thus conduces, we think to maintain it would be repugnant to the plain

The State v. Railway Co.

spirit of the Wilson act. That act, as we have seen, manifested the conviction of Congress that control by the States over the traffic of dealing in liquor within their borders was of such importance that it was wise to adopt a special regulation of interstate commerce on the subject. When, then, for the carrying out of this purpose the regulation expressly provided that intoxicating liquors coming into a State should be as completely under the control of a State as if the liquor had been manufactured therein, it would be, we think, a disregard of the purposes of Congress to hold that the owner of intoxicating liquors in one State can, by virtue of the commerce clause, go himself or send his agent into such other State, there in defiance of the law of the State, to carry on the business of soliciting proposals for the purchase of intoxicating liquors." (p. 99.)

It has been decided that congress has power to prescribe that a package of any article which it subjects to tax and upon which it requires the affixing of a stamp shall contain only the article which is subject to tax. (*Felsenheld v. United States,* 186 U. S. 126.) In the *Lottery Case,* 188 U. S. 321, it was argued that the suppression of lotteries is not an exercise of any power committed to congress by the constitution; that the sending of lottery tickets or policy slips does not constitute or evidence any transaction belonging to interstate commerce, and that "A legislative fiat' can not make that a commercial commodity which in its essential nature is not such. A transaction which is not commercial in its nature, can not become so merely by the declaration of congress." (p. 327.) But the conclusion reached was that lottery tickets are subjects of commerce, and the regulation of their carriage from state to state is a regulation of interstate commerce. In response to the argument that the statute in question did not regulate but prohibited the carrying of lottery tickets from one state to another, and that congress has no such power, it was replied that the constitution does not define what is to be deemed a legitimate regulation, and that it is to be determined when the question comes before the court whether congress, in prescribing a particular rule, has exceeded its power; that a large discretion is left to congress as to the means that may be employed in executing a given power. Then follows this query:

"Are we prepared to say that a provision which is, in effect, a *prohibition* of the carriage of such articles from State to State is not

40—96 KAN.

a fit or appropriate mode for the *regulation* of that particular kind of commerce? If lottery traffic, *carried on through interstate commerce,* is a matter of which Congress may take cognizance and over which its power may be exerted, can it be possible that it must tolerate the traffic, and simply regulate the manner in which it may be carried on? Or may not Congress, for the protection of the people of all the States, and under the power to regulate interstate commerce, devise such means, within the scope of the Constitution, and not prohibited by it, as will drive that traffic out of commerce among the States?" (p. 355.)

The answer reached by the court was:

"If the carrying of lottery tickets from one State to another be interstate commerce, and if Congress is of opinion that an effective regulation for the suppression of lotteries, carried on through such commerce, is to make it a criminal offence to cause lottery tickets to be carried from one State to another, we know of no authority in the courts to hold that the means thus devised are not appropriate and necessary to protect the country at large against a species of interstate commerce which, although in general use and somewhat favored in both national and state legislation in the early history of the country, has grown into disrepute and has become offensive to the entire people of the Nation. It is a kind of traffic which no one can be entitled to pursue as of right.

"That regulation may sometimes appropriately assume the form of prohibition is also illustrated by the case of diseased cattle, transported from one state to another. Such cattle may have, notwithstanding their condition, a value in money for some purposes, and yet it can not be doubted that Congress, under its power to regulate commerce, may either provide for their being inspected before transportation begins, or, in its discretion, may prohibit their being transported from one state to another." (p. 358.)

In closing the opinion, Mr. Justice Harlan said:

"We decide nothing more in the present case than that lottery tickets are subjects of traffic among those who choose to sell or buy them; that the carriage of such tickets by independent carriers from one state to another is therefore interstate commerce; that under its power to regulate commerce among the several states, Congress—subject to the limitations imposed by the constitution upon the exercise of the powers granted —has plenary authority over such commerce, and may prohibit the carriage of such tickets from state to state; and that legislation to that end, and of that character, is not inconsistent with any limitation or restriction imposed upon the exercise of the powers granted to Congress." (p. 363.)

In *United States v. Holliday,* 70 U. S. (3 Wall.) 407, an act of congress making it an offense to sell liquor to an Indian under the charge of any superintendent or agent appointed by the United States was attacked as beyond the power of con-

gress, but Mr. Justice Miller, in the opinion, in response to the argument that so far as the act was intended to operate as a police regulation to enforce good morals within the limits of a state there was no warrant in the constitution for its exercise by congress, said:

"It relates to buying and selling and exchanging commodities, which is the essence of all commerce, and it regulates the intercourse between the citizens of the United States and those tribes, which is another branch of commerce, and a very important one." (p. 417.)

After quoting from Chief Justice Marshall, in *Gibbons v. Ogden*, 22 U. S. (9 Wheat.) 1, that the power to regulate commerce with foreign states does not stop at the jurisdictional limits of such states and that if congress has power to regulate it that power can be exercised wherever the subject exists, it was further said:

"It follows from these propositions, which seem to be incontrovertible, that if commerce, or traffic, or intercourse, is carried on with an Indian tribe, or with a member of such tribe, it is subject to be regulated by Congress, although within the limits of a state." (p. 418.)

It would hardly be doubted that under its power to regulate commerce with foreign nations congress could prohibit the importation of a given commodity into this country. If, then, the same power which would authorize prohibiting the importation of a given article into this country authorizes congress to prohibit its sale anywhere in the United States to an Indian while a ward of the government, it would seem to be abundantly sufficient to warrant the removal of the protection incident to its interstate character from an article or commodity transported into a state in order to violate the laws thereof. Indirectly, it is a mere recognition by congress of the evil necessarily flowing from a conflict between an increasing volume of state legislation and the protection heretofore accorded by federal authorities to intoxicating liquor, regardless of the use and purpose for which it was carried from state to state. It is not perceived how this sort of recognition and comity on the part of the nation can be subversive of constitutional liberty or constitutional principles. Neither is it logically inconsistent with plenary power to regulate the traffic in such commodity between the states, because it is now the settled doctrine of the federal courts that interstate commerce is a

subject on which primarily congress alone may legislate and of which it alone has jurisdiction, and concerning which the states may not assume to act, except incidentally, whether congress sees fit to act or not. The inevitable corollary to this doctrine is that congress possesses over this subject power so ample and so complete that it may well remove from a commodity otherwise legitimate its interstate character and protection whenever its movement in interstate commerce is for the accomplishment of an unlawful purpose—the violation of the laws of one of the sister states of the Union. Those who contend for the invalidity of the act must base their reasoning on the slender platform that intoxicating liquor, when transported for the purpose of violating a state statute, is by some subtle constitutional alchemy of the same national importance and entitled to the same governmental protection as if it were brought into the state for the most beneficent purpose imaginable. We deem this line of argument and the conclusion resulting therefrom opposed to the true doctrine of constitutional interpretation and to the spirit expressed by the framers of the constitution when the preamble was formulated.

On the appeal by the state the point is sought to be made by the defendant that a question can not be reserved save upon an acquittal. But section 283 of the criminal code permits appeals to be taken by the state: "Third, upon a question reserved by the state," and under the decisions an acquittal is not a prerequisite. (*Junction City v. Keefe,* 40 Kan. 275, 19 Pac. 735; *The State v. Rook,* 61 Kan. 382, 59 Pac. 653; *The State v. Bland,* 91 Kan. 160, 136 Pac. 947.)

Counts twelve to twenty-four, inclusive, stated offenses, and testimony thereunder should have been admitted.

The twenty-fifth count is attacked for duplicity because it charges both the bringing in and the delivery of intoxicating liquor. But in misdemeanors this is permissible. (*The State v. Pryor,* 53 Kan. 657, 37 Pac. 169; *The State v. Meade,* 56 Kan. 690, 44 Pac. 619; *The State v. Taylor,* 90 Kan. 438, 440, 133 Pac. 861.)

The state offered to introduce in evidence certified copies of the records of the United States internal revenue collector showing that the consignees each held a receipt for taxes paid as wholesale malt liquor dealers. The offer was denied, and the

defendant contends that under the statute (Gen. Stat. 1909, § 4396) the evidence was incompetent because applicable only to prosecutions for maintaining a nuisance. This section makes the finding of intoxicating liquors on the premises, except in the case of a dwelling house, *prima facie* evidence that they are kept for sale or use in violation of law, and the finding of a stamp-tax receipt *prima facie* evidence that the person to whom it was issued was at the time of such finding maintaining a common nuisance. This does not render such evidence incompetent for other purposes, and in this case its only proper purpose was to show that the consignee had been engaged in the wholesale liquor business and for this purpose it should have been received. (*The State v. Nippert,* 74 Kan. 371, 86 Pac. 478; *The State v. Dollar,* 88 Kan. 346, 128 Pac. 365; *City of Topeka v. Briggs,* 90 Kan. 843, 135 Pac. 1184.)

On a motion to retax costs the trial court directed the clerk not to tax as costs the $25 attorney fee on each count covered by the conviction. Section 4366 of General Statutes of 1909 provides that upon notification or knowledge of any violation of any of the provisions of the laws of this state relating to intoxicating liquors, it shall be the duty of the prosecuting officer to inquire into the facts of such violation. If the testimony taken shall disclose that an offense has been committed it is the duty of the prosecuting officer to file complaint and proceed against the offender. Section 4377 provides that:

"The county attorney shall be allowed a fee of twenty-five dollars upon each count upon which the defendant shall be convicted, and the same shall be taxed as costs in the case, but the county shall in no case be liable therefor."

The Mahin law is now one of "the provisions of the laws of this state relating to intoxicating liquors" and therefore the fee requirement of section 4377 applies. (*The State v. Jepson,* 76 Kan. 644, 92 Pac. 600; *The State v. Poggmeyer,* 91 Kan. 633, 635, 138 Pac. 593.)

The judgment is affirmed as to the conviction under the first twelve counts. As to the foregoing matters raised by the state on its appeal the judgment is reversed and the cause is remanded for further proceedings, in accordance herewith.

DAWSON, J., not sitting.