No. 23,702.

THE COURT OF INDUSTRIAL RELATIONS, *Plaintiff*, v. THE CHARLES WOLFF PACKING COMPANY, *Defendant*.

SYLLABUS BY THE COURT.

1. INDUSTRIAL COURT—*May Maintain Action to Compel Obedience to Its Orders.* Under chapter 29 of the Laws of 1920, an action may be brought in the supreme court by the court of industrial relations to compel obedience to an order made by it.

2. SAME. Obedience to an order made by the industrial court fixing a schedule of wages and hours of labor may be compelled by an action in mandamus.

3. SAME. An action in the supreme court to compel obedience to an order made by the court of industrial relations does not call for the exercise of legislative powers.

4. SAME—*No Approval of Supreme Court Required to Make Its Orders Effective.* An order made by the court of industrial relations does not require the approval of the supreme court before becoming effective and binding.

5. SAME—*Petition Sufficient to Authorize Investigation of Wages Paid Employees.* The petition filed in this action alleged that such an emergency existed as justified the court of industrial relations in making an investigation.

6. CONSTITUTIONAL LAW—*Chapter 29, Laws of 1920, Is Constitutional.* Chapter 29 of the Laws of 1920, the court of industrial relations act, does not violate the fourteenth amendment to the constitution of the United States; those affected by the orders made under that law are not deprived of liberty or property without due process of law, and are not denied the equal protection of the law. Employees in the kinds of business named in the law are governed by the orders of the court of industrial relations; the wages paid such employees are affected with a public interest so as to subject such wages to regulation by the court; orders made under the law do not deprive employers nor employees of the freedom of contract concerning wages in violation of the fourteenth amendment to the constitution of the United States; and classification of the businesses to which the law applies is not arbitrary nor unjust.

Original proceeding in mandamus. Opinion filed October 8, 1921. Questions of law decided.

*Baxter D. McClain,* attorney of the court of industrial relations, for the plaintiff.

*D. R. Hite,* of Topeka, for the defendant.

*John S. Dean,* of Topeka, as *amicus curiæ.*

The opinion of the court was delivered by

MARSHALL, J.: This is an original proceeding in mandamus to compel the Wolff Packing Company, hereinafter named the defendant, to put in effect a scale of wages to be paid by it to its employees and to establish hours of labor as ordered by the court of industrial relations, hereinafter named the plaintiff. The defendant answers, and presents a number of questions of law in addition to those of fact. The plaintiff requests that the questions of law be disposed of in advance of the final hearing.

The defendant is operating a packing house in the city of Topeka. On March 21 and May 2, 1921, the plaintiff made orders and afterward served them on the defendant fixing wages to be paid and hours of labor to be observed by it in operating its business. The defendant refused to obey those orders. The questions of law, at the direction of the court, have been

briefed and argued, and will be disposed of at this time. This is authorized by section 278 of the code of civil procedure. It may be considered that the plaintiff has demurred to that part of the defendant's answer which presents questions of law.

1. The defendant contends that the court of industrial relations "cannot sue in its own name," and argues that the statute creating the court does not authorize it to so prosecute actions in this court. Section 12 of the industrial court act in part reads:

"In case of the failure or refusal of either party to said controversy to obey and be governed by the order of said Court of Industrial Relations, then and in that event said court is hereby authorized to bring proper proceedings in the supreme court of the state of Kansas to compel compliance with said order."

Section 27 of the code of civil procedure in part reads:

"A person expressly authorized by statute, may bring an action without joining with him the person for whose benefit it is prosecuted."

Section 265 of the code of civil procedure provides that:

"An injunction may be granted to enjoin the illegal levy of any tax, . . . and any number of persons whose property is or may be affected by a tax or assessment so levied . . . may unite in the petition filed to obtain such injunction."

Under the last statute the parties named may not only file the petition but may prosecute the action to final completion. Section 419 of the code of civil procedure provides for an action by the personal representative of a deceased person for his wrongful death, and section 420 provides that if the party whose death has been caused is a resident of this state, and no personal representative has been appointed, the action may be brought by the widow, or, where there is no widow, by the next of kin of such deceased. Under this section actions for wrongful death are constantly commenced and prosecuted to final judgment by the widows or the children of the deceased persons.

Section 8446 of the General Statutes of 1915, a part of the law establishing the board of railroad commissioners, in part reads:

"In case any railroad company, or any such officer, agent, employee, or person, shall violate or shall refuse or fail to obey any such order lawfully made by said board of railroad commissioners, any person ag-

grieved thereby may institute and prosecute mandamus proceedings in the supreme court, in the name of the state on the relation of such person, to compel compliance with and obedience to such order; and in any case where in the opinion of the board of railroad commissioners the interest of the public requires it, such board shall require such proceeding to be brought, and such proceeding shall then be brought by the attorney-general in the name of the state." (Laws 1901, ch. 286, § 38.)

Section 8447 in part reads:

"Whenever a proceeding brought in the supreme court under section 38 of this act by the attorney for the board, or the attorney-general, upon the direction of the board of railroad commissioners," etc. (Laws 1901, ch. 286, § 39, as amended by Laws 1907, ch. 268, § 8.)

Under these statutes it was held that:

"The attorney for the board of railroad commissioners is the proper officer to bring an action in the name of the state to compel compliance with an order of the board." (*The State, ex rel, v Railroad Companies*, 85 Kan. 649, syl. ¶ 1, 118 Pac. 872.)

Section 8367 of the General Statutes of 1915 reads:

"The commission may compel compliance with the provisions of this act and compel compliance with the orders of the commission by proceeding in mandamus, injunction or other appropriate civil remedies, or by appropriate criminal proceedings in any court of competent jurisdiction." (Laws 1911, ch. 238, § 39.)

In *City of Emporia v. Telephone Co.*, 90 Kan. 118, 133 Pac. 858, this court said:

"Section 39 empowers the utilities commission to compel compliance with its orders by proceedings in mandamus, injunction or other appropriate civil or criminal remedies." (p. 127.)

*The State, ex rel., v. Gas Co.*, 88 Kan. 165, 127 Pac. 639, was an action brought under the public utilities law by the state on the relation of the attorney for the public utilities commission, and no question was raised about the authority of the attorney to so prosecute the action.

The industrial court law is a remedial statute and should be liberally construed to promote its object. (Gen. Stat. 1915, § 11829; *Lumber Co. v. Douglas,* 89 Kan. 308, 316, 131 Pac. 563.) A liberal construction is that the statute gives to the court authority to prosecute in its own name actions of this character. The statute expressly authorizes the court of industrial relations to bring proper proceedings to compel compliance with its orders. Mandamus is a proper proceeding, and the court can bring it. The industrial court is not directly in-

terested in the result of this action; the state is the party that is interested, but the state has authorized the court to bring the action. This is at least one of the ways in which it may be brought.

2. The defendant contends that the purpose of this action cannot be accomplished by proceedings in mandamus, as the action is brought to compel the payment of definite wages to certain employees, and those employees have a right to bring actions against the defendant to recover judgments for wages legally due them. The argument is unsound for the reason that the action is not brought for the purpose named. It is brought to compel the defendant to obey an order of the court of industrial relations fixing a scale of wages and establishing hours of labor to be observed by the defendant in its business. Under the law directing that actions shall be brought by the real party in interest, unless otherwise specifically authorized by statute, the plaintiff cannot by an action in mandamus compel the defendant to pay any wages that may be due under the schedule ordered to be put in effect; such an action must be prosecuted by the workman to whom the wages are due. The present action is analogous to one brought by competent authority to compel a public service corporation to put in effect rates ordered by a proper, controlling body. The public service corporation can be compelled, in an action in mandamus, to put into effect such rates. Damages sustained by reason of the refusal of the public service corporation to obey the order of the controlling body can be recovered only in an action brought by the party injured.

3. Another contention of the defendant is that the nature of proceedings under section 12 of the industrial court act is legislative and not judicial. This contention is based on that provision of this section which gives to those who are governed by it the right to commence proceedings "to compel said court of industrial relations to make and enter a just, reasonable and lawful order in the premises." It is argued that whether or not a legislative regulation is just and reasonable is not a judicial question.

The statute does not require the supreme court to say what are just, reasonable or lawful wages, and then direct the industrial court to issue an order putting those wages into effect. If the latter court should refuse to make any order on

a proper application, then this provision of the statute will operate, and the party complaining can, by prosecuting a proper proceeding in the supreme court, compel the industrial court to make an order which when made would be subject to judicial investigation in a proper action the same as any other order made by that court.

One difficulty with this contention of the defendant is that no one is complaining of the refusal of the industrial court to put in effect a schedule of wages just and reasonable or otherwise, but the defendant is resisting a schedule ordered by the court of industrial relations, an altogether different question, one that is not involved in the position now taken by the defendant nor in the answer filed by it. For this reason the defendant cannot now avail itself of the objection, even if it were good. (*City of Kansas City v. Railway Co.,* 59 Kan. 427, 53 Pac. 468; *The State v. Smiley,* 65 Kan. 240, 69 Pac. 199; *The State v. Jack,* 69 Kan. 387, 398, 76 Pac. 911; *Brown v. Gilpin,* 75 Kan. 773, 90 Pac. 267; *The State v. Railway Co.,* 76 Kan. 467, 490, 92 Pac. 606; *The State v. Railway Co.,* 96 Kan. 609, 612, 152 Pac. 777; 8 Cyc. 787; 12 C. J. 760; *Hatch v. Reardon,* 204 U. S. 152, 160.)

4. The defendant insists that the orders of the industrial court are not effective until approved by the supreme court. This is based on a statement made by this court in *The State, ex rel., v. Howat,* 109 Kan. 376, as follows:

"Resort to this court was authorized in terms which afford opportunity for the determination of issues upon the court's independent judgment, both with respect to the law and the facts. (*Ohio Valley Co. v. Ben Avon Borough,* 253 U. S. 287.) The appellate jurisdiction of this court not being available because the court of industrial relations is a nonjudicial body, its constitutional jurisdiction in mandamus was utilized. This jurisdiction is precisely the same as that of any court of general jurisdiction in mandamus, that is to say, is plenary, may be exercised to control the action of inferior tribunals (*Bishop v. Fischer,* 94 Kan. 105, 145 Pac. 890; *In re Petitt,* 84 Kan. 637, 114 Pac. 1071), and comprehends the power of superintending control to the full extent of which the writ of mandamus is capable." (p. 392.)

The defendant says, "this ruling leads to the conclusion that it is contemplated by the act that this court is to pass upon the facts and render judgment as to the reasonableness and justness of the orders." The conclusion reached by the defendant is not warranted by the language quoted, and the industrial court law does not contain any such provision. An

order of the industrial court takes effect in the manner prescribed by law, and does not require the approval of the supreme court.

5. It is argued that the court of industrial relations can not exercise the extraordinary power of regulating wages to be paid by employers except in cases of emergency, and it is urged that no emergency is alleged. Section 7 of chapter 29 of the Laws of 1920 provides that:

"In case of a controversy arising between employers and workers, . . . engaged in any of said industries, . . . if it shall appear to said Court of Industrial Relations that said controversy may endanger the continuity or efficiency of service of any of said industries, . . . authority and jurisdiction are hereby granted to said Court of Industrial Relations, upon its own initiative, . . . to investigate said controversy, and to make such temporary findings and orders as may be necessary to preserve the public peace, . . . to settle and adjust all such controversies by such findings and orders as provided in this act. It is further made the duty of said Court of Industrial Relations, upon complaint of either party to such controversy, . . . if it shall be made to appear to said court that the parties are unable to agree and that such controversy may endanger the continuity or efficiency of service of any of said industries, . . . to proceed and investigate and determine said controversy in the same manner as though upon its own initiative."

In the present action the petition alleges that complaint in writing was made by certain persons, authorized by section 7 of the industrial court act to make such complaint, a copy of which is attached to and is made a part of the petition filed in this action. That complaint alleged that a controversy had arisen between the defendant and its employees engaged in the operation of the defendant's packing business, and "that said controversy has endangered and is continuing to endanger the continuous operation and efficiency of service of said packing plant, and does affect and will affect the manufacture and production of the commodities necessary for human food within the state of Kansas and within the vicinity where said packing plant is now operating, and will and does endanger the orderly operation of said packing plant." The petition sufficiently alleges that an emergency had arisen which justified the industrial court in taking cognizance of the complaint.

6. The defendant contends that the industrial court law and the orders sought to be enforced in this action violate the four-

teenth amendment of the constitution of the United States in that the law and the orders made thereunder deprive the defendant of its liberty and property without due process of law, and deny to it the equal protection of the laws. To support this contention the defendant argues that employees cannot be governed by the orders of the industrial court; that the wages of the defendant's employees are not affected with a public interest so as to subject such wages to regulation by the state; that the law and orders made by the industrial court deprive the defendant and its employees of the freedom of contract concerning wages; and that the classification of the businesses to which the law applies is arbitrary and unjust. These matters will be discussed in the order named.

The statute must be construed so as to uphold its validity, if possible. (*Comm'rs of Cherokee Co. v. The State, ex rel.,* 36 Kan. 337, 13 Pac. 558; *In re Burnette,* 73 Kan. 609, 85 Pac. 575; *Young v. Regents of State University,* 87 Kan. 239, 124 Pac. 150; *The State, ex rel., v. City of Lawrence,* 98 Kan. 808, 811, 160 Pac. 217.) "The principle is universal that legislation, whether by Congress or by a state, must be taken to be valid, unless the contrary is made clearly to appear." (*Reid v. Colorado,* 187 U. S. 137, 153.)

The basis of the contention that the defendant's employees cannot be governed by the industrial court is that those employees cannot be compelled to work for the wages fixed, while the defendant is compelled to operate its plant and to pay those wages. Section 17 of the act provides:

"That nothing in this act shall be construed as restricting the right of any individual employee engaged in the operation of any such industry, employment, public utility, or common carrier to quit his employment at any time, but it shall be unlawful for any such individual employee or other person to conspire with other persons to quit their employment or to induce other persons to quit their employment for the purpose of hindering, delaying, interfering with, or suspending the operation of any of the industries, employments, public utilities, or common carriers governed by the provisions of this act, or for any person to engage in what is known as 'picketing,' or to intimidate by threats, abuse, or in any other manner, any person or persons with intent to induce such person or persons to quit such employment, or for the purpose of deterring or preventing any other person or persons from accepting employment or from remaining in the employ of any of the industries, employments, public utilities, or common carriers governed by the provisions of this act."

It must be noted that this provision of the act takes from employees some of that which has been heretofore considered their legal right. Let us look now to the restrictions placed on the employer. Section 6 of the act reads:

"It is hereby declared and determined to be necessary for the public peace, health and general welfare of the people of this state that the industries, employments, public utilities and common carriers herein specified shall be operated with reasonable continuity and efficiency in order that the people of this state may live in peace and security, and be supplied with the necessaries of life. No person, firm, corporation, or association of persons shall in any manner or to any extent, wilfully hinder, delay, limit or suspend such continuous and efficient operation for the purpose of evading the purpose and intent of the provisions of this act; nor shall any person, firm, corporation, or association of persons do any act or neglect or refuse to perform any duty herein enjoined with the intent to hinder, delay, limit or suspend such continuous and efficient operation as aforesaid, except under the terms and conditions provided by this act."

Part of section 16 reads:

"It shall be unlawful for any person, firm, or corporation engaged in the operation of any such industry, employment, utility, or common carrier wilfully to limit or cease operations for the purpose of limiting production or transportation or to affect prices, for the purpose of avoiding any of the provisions of this act; but any person, firm or corporation so engaged may apply to said court of industrial relations for authority to limit or cease operations, stating the reasons therefor, and said court of industrial relations shall hear said application promptly, and if said application shall be found to be in good faith and meritorious, authority to limit or cease operations shall be granted by order of said court."

Part of section 17 reads:

"It shall be unlawful for any person, firm, or corporation, . . . engaged in any of such industries, employments, utilities or common carriers to do any act forbidden, or to fail or refuse to perform any act or duty enjoined by the provisions of this act, for the purpose or with the intent to hinder, delay, limit, or suspend the operation of any of the industries, employments, utilities or common carriers herein specified or indicated, or to delay, limit, or suspend the production or transportation of the products of such industries, or employments, or the service of such utilities or common carriers."

Section 20 in part reads:

"In case of the suspension, limitation or cessation of the operation of any of the industries, employments, public utilities or common carriers affected by this act, contrary to the provisions hereof, or to the orders of said court made hereunder, if it shall appear to said court that such suspension, limitation, or cessation shall seriously affect the public welfare

by endangering the public peace, or threatening the public health, then said court is hereby authorized, empowered and directed to take proper proceedings in any court of competent jurisdiction of this state to take over, control, direct and operate said industry, employment, public utility or common carrier during such emergency."

An analysis of these statutes reveals that the defendant is restricted from doing certain things with the intention of violating the law, or in other words is restricted from doing those things prohibited by the law. But the defendant is not, by the law, compelled to operate its plant at a loss, nor is it prohibited from changing its business, nor from quitting the business, if it desires to·do either of these things in good faith, not intending thereby to violate any provision of the act. The language of the act will bear this construction; it will uphold the validity of the act, and not deprive the defendant of any constitutional right that has been urged by it.

The law governing public service corporations is somewhat closely analogous to the law now under consideration. The United States supreme court has held that a railroad may be compelled by mandamus to perform those duties that are required by law. (*Northern Pacific Railroad v. Dustin,* 142 U. S. 492; *Union Pacific R. R. Co. v. Hall et al.,* 91 U. S. 343; *Covington Stock-Yards Co. v. Keith,* 139 U. S. 128.) In *City of Potwin Place v. Topeka Rly. Co.,* 51 Kan. 609, 33 Pac. 309, the supreme court of Kansas said:

"The performance of the duties which a street railway company owes to the public to operate its lines in accordance with the provisions of a city ordinance under which its road was constructed may be enforced by *mandamus.*" (Syl. ¶ 1.)

In *The State, ex rel., v. D. C. M. & T. Rly. Co.,* 53 Kan. 377, 36 Pac. 747, the following language was used:

"The roadbed and superstructure of a railroad built under a charter obtained in accordance with the laws of this state ·are charged, not only in the hands of the original corporation, but of purchasers as well, with the burden of the company's charter obligations, and cannot be diverted from the purpose to which it was devoted, nor relieved from this burden without the consent of the state, duly expressed by the legislature or other competent authority." (Syl.)

In *City of Topeka v. Water Co.,* 58 Kan. 349, 49 Pac. 79, this court held that—

"Mandamus may be employed to compel a water company to extend its mains in a city, where under the contract between the city and the

company it is the duty of the company to make such extension." (Syl. ¶ 2. See, also, *Railroad Co. v. Nyce,* 61 Kan. 394, 407, 59 Pac. 1040.)

In *The State, ex rel., v. Postal Telegraph Co.,* 96 Kan. 298, 150 Pac. 544, this court said:

"Where a telegraph company maintained a telegraph station for a number of years at an average deficit of $134.33 per annum it should have applied to the public utilities commission to discontinue it, and it was unlawful to close the station and quit business thereat until such permission was granted." (Syl. ¶ 3.)

Those were public utilities cases, in each of which a franchise had been granted either by the state or a municipal corporation, and a contract had been entered into, either express or implied, that the public utility would perform the service named. It is now well settled that the services performed by public service corporations are affected with the public interest, but the time was when that principle was earnestly denied. These cases might lead to the conclusion that a public service corporation is compelled to perform its duties even at a loss, but that principle is denied in a number of cases, one of which is *Brooks-Scanlon Co. v. R. R. Comm.,* 251 U. S. 396, where the supreme court of the United States said:

"A common carrier cannot, under the Fourteenth Amendment, be compelled by a State to continue operation of its railroad at a loss." (Syl. ¶ 1.)

This rule is followed in *Bullock v. R. R. Comm. of Florida,* 254 U. S. 513. In the Brooks-Scanlon Co. case it was said that "a carrier cannot be compelled to carry on even a branch of business at a loss, much less the whole business of carriage." (p. 399.) A note on this subject is found in 11 A. L. R. 252, appended to a case, *Lyon & Hoag v. Railroad Commission,* 190 Pac. 795, where the supreme court of California held that the state had no power to compel the continued operation of a public utility at a loss. The authorities lead to this conclusion, that public utilities can be compelled to operate, but not at a loss. Control of public service corporations is justified by the fact that they are affected with a public interest. The defendant is operating a packing plant. It is not a public service corporation, but the legislature has declared that its business is affected with a public interest, and for that reason has assumed to exercise control over it. For a recital of the

facts justifying that declaration, *The State, ex rel., v. Howat,* 109 Kan. 376, is referred to.

If the defendant is conducting a business that is affected with a public interest, it ought to be subject to legislative control the same as if it were conducting a waterworks system, an electric light plant, or a railroad. When the defendant's business became affected with a public interest, the public had the right to say something about the manner in which it should be conducted. The legislature has undertaken to do so, has provided for the regulation of that business, and has placed certain prohibitions on the manner in which it shall be conducted; but the legislature has not said that the defendant cannot under any circumstances cease to operate its packing plant if it desires so to do. The permission that must be obtained from the industrial court by the defendant is not permission to do those things which it may rightfully do under the law, but is permission without which the defendant, in doing other things, would be violating the law. In *The State, ex rel., v. Howat,* 109 Kan. 376, the court said:

"Limiting production and withdrawing from production are expressly permitted, for any purpose which does not contemplate circumvention of the law." (p. 414.)

The defendant argues that the compensation paid to its employees for services rendered is not affected with a public interest, but does not argue that the defendant's business is not affected with a public interest. In response to the defendant's argument we begin by quoting from *Munn v. Illinois,* 94 U. S. 113, where the supreme court of the United States said:

"This brings us to inquire as to the principles upon which this power of regulation rests, in order that we may determine what is within and what without its operative effect. Looking, then, to the common law, from whence came the right which the Constitution protects, we find that when private property is 'affected with a public interest, it ceases to be *juris privati* only.' This was said by Lord Chief Justice Hale more than two hundred years ago, in his treatise *De Portibus Maris,* 1 Harg. Law Tracts, 78, and has been accepted without objection as an essential element in the law of property ever since. Property does become clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large. When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created. He may withdraw his grant by discon-

tinuing the use; but, so long as he maintains the use, he must submit to the control." (p. 125.)

This principle has been followed so many times in so many states that a review of the legislation and of the decisions arising thereunder would be a herculean and useless task. A résumé of the decisions following this principle is found in 9 Rose's Notes, Rev. ed., 519-542. But the question argued is not that the business of the defendant is not affected with a public interest, but is that the wages of the defendant's employees are not affected with a public interest. The state may control the rates to be charged by those who are engaged in a business affected with a public interest. Wages is one of the largest factors that go to make up the expense of conducting a business and must be considered in determining what the rate shall be. In many instances wages cannot be increased unless rates or charges are increased, and in many instances rates or charges cannot be decreased unless wages are decreased. In all business enterprises affected with a public interest rates or charges and wages are so bound together that they cannot be separated. Rates cannot be completely controlled unless wages are controlled, and wages cannot be controlled unless charges are controlled.

The compensation paid to workingmen for their labor is the most fruitful cause of industrial unrest and of the conditions produced thereby. The state is not powerless to regulate the wages to be paid for labor in those enterprises without the continuance of which the people must suffer. Hours of labor have been the subject of legislative action, and a number of laws fixing hours of labor have been upheld. In *Barbier v. Connolly,* 113 U. S. 27, and *Soon Hing v. Crowley,* 113 U. S. 703, an ordinance of the city of San Francisco fixing the hours between which washing and ironing must be done in public laundries was upheld. In *Holden v. Hardy,* 169 U. S. 366, the supreme court approved a law of the state of Utah fixing eight hours as the period of employment for men working in underground mines, smelters and other institutions for the reduction or refining of ores or metals. The principle that was followed in *Holden v. Hardy* was followed in *Matter of Application of Martin,* 157 Cal. 51, 57; *State v. Cantwell,* 179 Mo. 245; *State v. Livingston Concrete, etc., Mfg. Co.,* 34 Mont. 570;

*Ex Parte Boyce,* 27 Nev. 299; *Ex Parte Kair,* 28 Nev. 127; id., 28 Nev. 425.

A law prohibiting those engaged in manufacturing or repairing to work their employees more than ten hours per day except in cases of emergency, or where necessity requires it, was upheld in *State v. Lumber Co.,* 102 Miss. 802, and 103 Miss. 263. The court of appeals of New York held that the legislature had power to enact a law making it unlawful for a railroad employee in charge of a block-signal tower to be on duty more than eight hours in twenty-four, in *People v. Erie Railroad Co.,* 198 N. Y. 369. A law fixing a day's work for conductors, gripmen and motormen on street railways at ten hours, to be performed within twelve consecutive hours, was declared valid in an opinion to the governor by the supreme court of Rhode Island, in 24 R. I. 603.

Numerous laws fixing and regulating the hours of labor for women have been held valid under the police powers of the states. (*Muller v. Oregon,* 208 U. S. 412; *Riley v. Massachusetts,* 232 U. S. 671; *Matter of Application of Miller,* 162 Cal. 687; *Ritchie & Co. v. Wayman,* 244 Ill. 509; *The People v. Elerding,* 254 Ill. 579; *Commonwealth v. Hamilton Manufacturing Co.,* 120 Mass. 383; *Commonwealth v. Riley,* 210 Mass. 387; *Withey v. Bloem,* 163 Mich. 419; *Wenham v. State,* 65 Neb. 394; *People v. Charles Schweinler Press,* 214 N. Y. 395; *Commonwealth v. Beatty,* 15 Pa. Super. Ct. 5; *State v. Buchanan,* 29 Wash. 602; *State v. Somerville,* 67 Wash. 638.)

In *Muller v. Oregon,* supra, one of the headnotes reads:

"As healthy mothers are essential to vigorous offspring, the physical well-being of woman is an object of public interest. The regulation of her hours of labor falls within the police power of the State, and a statute directed exclusively to such regulation does not conflict with the due process or equal protection clauses of the Fourteenth Amendment." (Syl. ¶ 3.)

In *Atkins v. Kansas,* 191 U. S. 207, a law fixing eight hours as a day's work for all laborers employed by or on behalf of the state or any of its municipalities, was upheld. Similar laws have been upheld in *The People v. City of Chicago,* 256 Ill. 558; *Sweeten v. State,* 122 Md. 634; *People, ex rel. W. E. & C. Co., v. Metz,* 193 N. Y. 148; *Byars v. State,* 2 Okla. Cr. 481; *Ex Parte Steiner,* 68 Ore. 218.

Laws establishing minimum wages for women have been passed in a number of states, and have been upheld by courts. (*State v. Crowe,* 130 Ark. 272; *Williams v. Evans,* 139 Minn. 32; *Stettler v. O'Hara,* 69 Ore. 519; *Simpson v. O'Hara,* 70 Ore. 261; *Larsen v. Rice,* 100 Wash. 642.)    Appeals in *Stettler v. O'Hara* and *Simpson v. O'Hara* were affirmed by the United States supreme court, equally divided.    (243 U. S. 629.)    A very able opinion on this question is by the court of appeals of the District of Columbia.    (*The Children's Hospital v. Adkins,* recently decided.)    There an act of congress fixing a minimum wage for women and minors was held valid.

Laws fixing minimum wages and hours of labor for women are justified on moral and physical grounds; laws fixing wages for men may be justified on similar, although not the same, grounds.    Sex is a proper basis for classification of the subjects of this kind of legislation, but it does not answer constitutional objections.    The dangers to a man while working should be reduced to a minimum; the conditions under which he labors, so far as possible, should be conducive to health and comfort.    Intensive work of either mind or body, or both, should not be continued beyond his powers.    A laboring man with a family, for honest work, should receive wages sufficient to enable him to feed, clothe and shelter his family, and educate his children.    If the wages received by him are not sufficient to do these things, he becomes discontented, and the evil consequences that flow from such discontent may follow. The state should, it does, have power to protect laboring men to the same extent that it protects working women.

Before the law the rights of men and women ought to be equal; they are equal.    If a man has an absolute right under all conditions to contract for the wages that he shall receive, a woman ought to and does have the same right.    If the state under its police power can interfere with that right on the part of a woman it ought to be, and is, able to interfere with that right on the part of a man.    The state is as much interested in the protection of the one as it is in the protection of the other.    A statute may very properly be enacted for the protection of women, but that would not in any way weaken the constitutional right to object to it on any valid ground.

In *Lochner v. New York,* 198 U. S. 45, the supreme court said:

"Section 110 of the labor law of the state of New York, providing that no employees shall be required or permitted to work in bakeries more than sixty hours in a week, or ten hours a day, is not a legitimate exercise of the police power of the state, but an unreasonable, unnecessary and arbitrary interference with the right and liberty of the individual to contract, in relation to labor, and as such it is in conflict with and void under the Federal constitution." (Syl. ¶ 4.)

That case seems not to have been overruled, but what appears to this court to be a contrary rule was declared in *Wilson v. New,* 243 U. S. 332. In 1916 a general strike of railroad employees in the United States was threatened. To avoid that strike congress passed the Adamson law, which fixed eight hours as a day's work, and fixed the wages that should be paid at not less than the then standard per day and a *pro rata* wage for overtime. That law was upheld in *Wilson v. New,* supra, where the court declared that congress had authority to pass the law under the commerce clause of the constitution. If under the commerce clause of the Federal constitution congress can regulate wages and hours of labor of those working on railroads, the state, under the police power, should be able to regulate the wages and hours of labor of those working in a packing plant operating wholly within the state. The powers of congress under the commerce clause of the constitution are no greater than the authority of the state under the police power. Congress is controlled by the fifth amendment to the constitution, which provides that no person shall be deprived of life, liberty or property without due process of law, while the state is bound by the fourteenth amendment, which provides that no state shall deprive any person of life, liberty or property without due process of law. Congress in its entire field of legislation must be obedient to the fifth amendment the same as the states in their field of legislation must be obedient to the fourteenth amendment to the Federal constitution. In *Wilson v. New,* 243 U. S. 332, one basis for upholding the Adamson law as expressed in the syllabus was as follows:

"In an emergency arising from a nation-wide dispute over wages between railroad companies and their train operatives, in which a general strike, commercial paralysis and grave loss and suffering overhang the country because the disputants are unable to agree, Congress has

power to prescribe a standard of minimum wages, not confiscatory in its effects but obligatory on both parties, to be in force for a reasonable time, in order that the calamity may be averted and that opportunity may be afforded the contending parties to agree- upon and substitute a standard of their own."  (Syl. ¶ 4.)

Legislation to meet emergencies arising in the state similar to those arising in the nation ought to be upheld for reasons the same or similar to those given in *Wilson v. New*.  The duty of the Federal government to protect from suffering the people of the nation is no more binding than that of the government of the state to protect its people from suffering.  If the Adamson law was compelled by an emergency, the Kansas industrial court law was likewise compelled by an emergency.  The purpose of the latter law is to meet such emergencies as will prevent a suspension or interference with the operation of the several kinds of business named in that law.  This purpose is revealed by the entire act.  Section 9 of the act might bear a contrary interpretation, but in *The State, ex rel., v. Howat*, 109 Kan. 376, concerning section 9 this court said:

"Section 9 does not authorize a general revision of labor contracts.  In congruity with other sections, it does no more than provide that contracts shall not thwart achievement of the public purposes of the statute.  No contract may be modified except in an action or proceeding properly before the court, that is, an action or proceeding relating to a controversy. If, in dealing with the emergency created by a controversy, the court encounters a contract which would hamper the making of a necessary order, the contract may be treated as any other element of the situation.  No contract is to be regarded as unfair, unjust, or unreasonable, that is not an impediment to settlement of a controversy, and orders respecting contracts of the obstructive character are merely ancillary to determination of the controversy.  The power exercised in making such orders is the same power which takes entire charge of a mine and operates it during an emergency."  (p. 415.)

A part of the subject that has just been discussed and inseparably connected with it is the defendant's contention that the law deprives employers and employees of the freedom of contract concerning wages.  Practically every law regulating the conduct of men restricts their freedom of action, and practically every law regulating business affected with a public interest restricts the freedom of contract.  Every law that has been passed regulating wages or the hours of labor has been a law restricting the freedom of contract.  A large number of

these have been upheld, and they must continue to be upheld if the state is to perform its governmental functions and prevent violence caused by controversies between employers and employees over these questions. If the state can make regulations for the government of a business affected with a public interest, it ought to be able to extend that regulation to the wages paid to the employees of that business. The flow of food supply from producer to consumer should not be stopped by conditions produced by industrial unrest arising out of wage problems. If that flow is threatened and the state under its police power can remove the danger, that should be done. That and that alone the Kansas industrial court law attempts to do.

The statute separates those engaged in the business of manufacturing or preparation of food products, manufacturing of clothing and wearing apparel, the mining and production of fuel, and transportation of food products, clothing and fuel, and public utilities, from those engaged in all other kinds of business within the state. The defendant says that this classification of the subject matter of legislation is arbitrary and unjust. This is an old field of legal debate; it has been before the court, both state and Federal, on a large number of occasions. The rules declared by the courts may be summarized as follows: the fourteenth amendment to the constitution of the United States does not require state statutes to operate indiscriminately, but does admit of the classification of the subject matter of legislation; the constitution does not prohibit special legislation merely as such; a state law may be limited in its operation as to persons but must be uniform for all in like circumstances within the sphere of operation of the statute; rigid equality is not required; the legislature is permitted a wide discretion, but the classification must be reasonable and not arbitrary nor hostile. (4 Enc. U. S. Supreme Court Reports, 358-367; 6 R. C. L. 397, 403; 12 C. J. 1128-1138.) The successful operation of the four classes of business named, one of which includes packing houses, is necessary for the peace, comfort and welfare, and particularly of the health, of the people. These industries are subject to interruption on account of conditions now existing. Those engaged in these industries constantly work in the presence of danger. Long hours of continuous employment will render them less able to avoid those

Werner v. Winzer.

dangers because of the weariness that overtakes anyone who for a long period of time continuously works at any one thing. Constant employment at the same task for long hours day after day will render the worker both physically and mentally less able to perform his labor. Protection to the workman in these industries demands that his daily hours of labor be not so extended as to prematurely exhaust his powers.

The legislature had power to enact the industrial court law, and to make it apply to the classes of business named therein, without including any other class.

The demurrer of the plaintiff to that part of the answer of the defendant presenting questions of law is sustained.