No. 23,702.

THE COURT OF INDUSTRIAL RELATIONS, *Plaintiff*, v. THE CHARLES WOLFF PACKING COMPANY, *Defendant*.

SYLLABUS BY THE COURT.

1. JURISDICTION—*Court of Industrial Relations—Authority to Fix Scale of Wages and Hours of Labor for Employees in a Packing House Plant.* The court of industrial relations has authority to make an order establishing wages to be paid employees and fixing the hours of labor to be observed in a packing house plant employing approximately three hundred men, where a controversy has arisen over wages and hours of labor and a meeting has been called to take a strike vote, and where instead of voting to strike, the employees have voted to submit the controversy to the court of industrial relations and have submitted that controversy to that court.

2. SAME—*Jurisdiction of Industrial Court Limited to Matters Embraced in Notice Given.* The court of industrial relations cannot make orders to be observed by the operators of a packing house plant beyond the matters embraced within the notice given, unless the operators consent that matters outside the notice may be investigated.

3. SAME—*Packing Plant Being Operated at Loss—Power of Industrial Court.* Under proper circumstances, the court of industrial relations can make an order, temporary in effect, slightly raising the wages of employees in a packing house plant and fixing the hours of labor, although the plant at the time the order is made is being operated at a loss.

Original proceeding in mandamus. Opinion filed June 10, 1922. Writ allowed.

*Baxter D. McClain, Randal C. Harvey,* and *John G. Egan,* all of Topeka, for the plaintiff.

*D. R. Hite,* of Topeka, for the defendant.

The opinion of the court was delivered by

MARSHALL, J.: This is a continuation of *Court of Industrial Relations v. Packing Co.,* 109 Kan. 629, 201 Pac. 418. There this court said:

"This is an original proceeding in mandamus to compel the Wolff Packing Company, hereinafter named the defendant, to put in effect a scale of wages to be paid by it to its employees and to establish hours of labor as ordered by the court of industrial relations, hereinafter named the plaintiff." (p. 630.)

The former opinion disposed of a number of legal questions. This is an opinion in the same action and disposes of the questions that arise on the evidence.

1: The evidence, which was taken by A. L. Noble, of Wichita, who was by this court appointed commissioner to take the evidence and make findings of fact and conclusions of law, shows that the defendant was engaged in operating a packing plant in the city of Topeka for the purpose of slaughtering animals for food; that the defendant employed about 300 workmen in the operation of its plant; that a controversy arose between the defendant and its employees concerning wages, hours of labor, and certain conditions under which the employees worked; that a meeting of the employees was called for the purpose of voting on a proposition to strike on account of the controversy; that at the meeting thus called the employees voted to present the controversy to the plaintiff rather than to strike; and that thereafter a complaint was filed with the plaintiff. It is now insisted that the evidence does not show such an emergency as gives to the plaintiff jurisdiction to make any order on the complaint that was filed.

On the former hearing it was contended by the defendant that the pleadings did not allege that such an emergency existed as gave to the plaintiff the extraordinary power of regulating the wages to be paid by the defendant to its employees. This court in the syllabus to the former opinion said:

"The petition filed in this action alleged that such an emergency existed as justified the court of industrial relations in making an investigation." (¶ 5.)

What was said in the former opinion is approved. The defendant's plant is a small one, and it may be admitted that, if it should cease to operate, the effect on the supply of meat and food in this state would not greatly inconvenience the people of Kansas; yet, the plant manufactures food products and supplies meat to a part of the people of this state, and, if it should cease to operate, that source of supply would be cut off. The plant comes within the operation of the law, and the court of industrial relations has power to make the orders provided by law under the circumstances named in the statute. The petition alleged facts which showed that such an emergency as the law contemplates existed and gave to the plaintiff authority to inquire concerning the matters alleged in the complaint. The evidence established facts sufficient to give to the court of industrial relations authority to make proper orders thereunder.

Another matter that may be properly mentioned in connection with the discussion of this subject is that there is a presumption that the plaintiff made its order under proper circumstances. That

presumption is not conclusive; it is rebuttable; yet, the presumption exists and whatever weight it has must of necessity be placed in support of the order made by the court of industrial relations, although, in an action to compel compliance with an order of that court, the court trying the action must determine the matter for itself.

2. The plaintiff has filed a large number of exceptions to the report of the commissioner, both as to matters of fact and matters of law. The commissioner reported, as one of his conclusions of law, that the orders contained in paragraphs 1, 5, 6, 7, 8, 10, 12, 13, and 16 of the order of the plaintiff were made without jurisdiction and are unenforceable. This makes it necessary to set out those orders. The plaintiff ordered that—

"1. In this industry the principles of the open shop, as now and heretofore existing by agreement of the parties, are approved by the court and shall continue.

"2. Employees, whether organized or unorganized, shall receive wages as shown in schedules hereinafter set out.

"3. A basic working day of eight hours shall be observed in this industry; but a nine-hour day may be observed not to exceed two days in any one week without penalty: *Provided, however,* That if the working hours of the week shall exceed forty-eight in number, all over forty-eight shall be paid for at the rate of time and one-half; furthermore, in case a day in excess of the eight-hour day shall be observed more than two days in any one week, all over eight hours, except for said two days in said week, shall be paid for at the rate of time and one-half, even though the working hours of the week may be forty-eight hours or fewer.

"4. No guarantee of time per week is specifically ordered; but sufficient work shall be offered to the regular employees in each and every month so that the monthly earnings of regular workers will be sufficient to constitute a fair wage under the Kansas industrial law, as heretofore defined by this court.

"5. The management of the industry shall, whenever possible, notify the workers in case the plant is not to operate the following day, by bulletins posted at the time clock prior to the closing hour, and if that be impossible, then by signal from the steam whistle the following morning, to make it unnecessary for workers to come to the plant when there will be no work.

"6. *Hours of beginning work shall be set by the management and may be changed when necessary;* but reasonable notice shall be given the employees of changes.

"7. The seniority rule as heretofore observed in the industry may continue.

"8. Reasonable rules and regulations in regard to conduct about the plant may be made from time to time as the same may be necessary, and reasonable notice of all such shall be given by posting at the time clock or personal notice to employees.

Court of Industrial Relations v. Packing Co.

"9. Women workers shall receive the same wages as men engaged in the same class and kind of work.

"10. Toilets and dressing rooms used by the women workers shall be in charge of a woman.

"11. Piece-work rates shall be paid in accordance with piece-work schedule herein set out.

"12. Minor details in regard to work and wages cannot be set out in an order of this court; but whenever differences arise at any time they should be taken up by the grievance committee of the employees and the management, and reasonable time shall be allowed for consideration and adjustment of the differences.

"13. The total working time for women employees, inclusive of overtime, shall not exceed fifty-four hours in any one week and not more than nine hours in any one day.

"14. Workers paid by the week or day, if employed within the plant and not within the office or sales department, shall be subject to hours of work and overtime as other employees under the terms of finding No. 3 hereof.

"15. The temporary order heretofore made in this case shall stand and be complied with by the respondent company, beginning on the date of said temporary order and continuing until May 1, 1921, the date of this order.

"16. The respondent company shall, within a reasonable time, furnish a suitable room for its employees in which to eat their midday lunch, well ventilated and apart from those portions of the packing house in which the work of slaughtering animals and dressing and preparing the packing products are carried on, and apart from toilets and dressing rooms.

"17. The following schedule of minimum wages shall be paid by the respondent company to its respective employees, to wit: [The details of the schedule are immaterial.]

"18. The establishing of the above minimum-wage schedule shall not in any way be construed as restricting or preventing the respondent from paying a higher wage when the same is deemed advisable.

"19. In departments operating twenty-four hours a day and seven days a week, each employee therein shall be entitled to one day off each week. In other departments work performed on Sunday and legal holidays shall be paid for at the rate of time and one-half.

"This order shall take effect and be in force on the 1st day of May, 1921, and shall continue until changed by the court, or changed by agreement of the parties with the approval of the court."

The conclusion of law reached by the commissioner was based on the fact that the complaint filed with the plaintiff did not allege anything to give the court jurisdiction to make orders concerning the subjects mentioned in paragraphs 1, 5, 6, 7, 8, 10, 12, 13, and 16 of the order. An examination of the complaint reveals that nothing was said concerning any of these matters.

The plaintiff urges that those matters were embraced within the complaint because they were embraced within the contract

between the defendant and its employees and that a copy of the contract was attached to the complaint. The plaintiff also contends that the defendant waived its right to object to those parts of the order being put into effect because the defendant insisted on the contract being introduced in evidence and because the defendant, through its attorney, stated to the court of industrial relations that he was "authorized to make a proposal to the court, that it is not prepared to accept the terms of the order of March 21, 1921, making the eight-hour day as the basic day, with time and one-quarter for the ninth hour and time and one-half thereafter, but as a counter proposal the Charles Wolff Packing Company proposes to adopt the forty-eight-hour week, meaning thereby that employees shall be paid the regular schedule for forty-eight hours' work, and all time employed over forty-eight hours' work shall be paid for at the rate of time and one-half; the employees, if working less than forty-eight hours, shall be paid at the regular schedule for the time actually engaged, but the company does not consent to the fixing of any guaranty of hours per week." On the hearing before that court, the defendant unqualifiedly agreed to make the wages of women the same as those of the men for the same kind of work. That agreement was put into effect, and there is now no controversy about that portion of the order. Other than the agreement concerning the wages of women, it does not appear that the defendant submitted for the consideration of the plaintiff anything except what was contained in the complaint. An examination of the complaint reveals that the only questions named in it were wages and hours of labor.

Section 10 of chapter 29 of the Laws of 1920, the court of industrial relations act, reads:

"Before any hearing, trial or investigation shall be held by said court, such notice as the court shall deem necessary shall be given to all parties interested by registered U. S. mail addressed to said parties to the post office of the usual place of residence or business of said interested parties when same is known, or by the publication of notice in some newspaper of general circulation in the county in which said industry or employment, or the principal office of such utility or common carrier is located, and said notice shall fix the time and place of said investigation or hearing. The costs of publication shall be paid by said court out of any funds available therefor. Such notice shall contain the substance of the matter to be investigated, and shall notify all persons interested in said matter to be present at the time and place named to give such testimony or to take such action as they may deem proper."

The notice served on the defendant was a copy of the complaint with a copy of the contract between the defendant and its employees. Such a notice as is required by the statute was not given to the defendant concerning the subjects named in paragraphs 1, 5, 6, 7, 8, 10, 12, 13, and 16 of the order of the court of industrial relations, and the defendant did not voluntarily submit to an inquiry into those matters. It follows that the court had no jurisdiction to make any order concerning any of them. However, it should be stated that if, in the course of its investigation, matters that ought to be considered should come to the knowledge of the court, it may investigate them and make orders concerning them after taking the necessary steps to acquire jurisdiction.

3. The commissioner found and the evidence shows that for some time prior to the making of the order by the plaintiff, the defendant had been operating its plant at a loss, but the evidence does not show what was the cause of the loss. The order made by the court of industrial relations slightly raised the wages of the employees over the wages that were in effect at the time the order was made.

The stock of the defendant's plant is largely held by the Allied Packers, a Delaware corporation with headquarters at Chicago, Ill., operating six other meat-packing plants situated in eastern cities and in Canada. A portion of the proceeds arising from the defendant's plant is paid over to the Allied Packers. How much does not appear.

Section 8 of chapter 29 of the Laws of 1920, the court of industrial relations act, provides that—

"If either party to such controversy shall in good faith comply with any order of said court of industrial relations for a period of sixty days or more and shall find said order unjust, unreasonable or impracticable, said party may apply to said court of industrial relations for a modification thereof and said court of industrial relations shall hear and determine said application and make findings and orders in like manner and with like effect as originally. In such case the evidence taken and submitted in the original hearing may be considered."

The court of industrial relations, in its opinion on which the order was based, said:

"Any order made by this court, after having been put into force and effect for a period of sixty days, may be reviewed at the instance of either party and additional evidence introduced to show its practicability, its impracticability, its reasonableness or its unreasonableness. The order made in this case at this time will be made in view of that provision of the law. The business condi-

Court of Industrial Relations v. Packing Co.

tions of the day are unusual and unstable, and sixty days or ninety days may bring about such changes as would require a revision of any order made herein."

Laws and orders fixing rates for a period of time for public utilities have been sustained to determine their effect upon the revenue of such utility. (*Wilcox v. Consolidated Gas Co.*, 212 U. S. 19, 55; *Northern Pacific Ry. v. North Dakota*, 216 U. S. 579; *Lincoln Gas Co. v. Lincoln*, 250 U. S. 256, 269.)

The defendant's plant is being operated at a loss, and the order of the court of industrial relations increases the wages of its employees. Is the order invalid for that reason? The general schedule of rates charged by a public service corporation cannot be decreased by lawfully constituted regulating bodies when the business of that corporation, otherwise prudently and efficiently conducted, is being operated at a loss. This, so far as state regulation is concerned, is based on the fourteenth amendment to the constitution of the United States prohibiting any state from depriving any person of property without due process of law, and from denying to any person within its jurisdiction the equal protection of the law. Compelling a public service corporation to render service at a loss is a violation of the prohibitions contained in the fourteenth amendment; but rates and wages are not the same. Rates are compensation paid by those who desire the services of public service corporations for the services rendered by such corporations. Wages, for the purposes now under discussion, are that part of the cost of the finished product given to those who perform service in its production. Another way of distinguishing the two, is that rates are the prices paid to public service corporations for their finished product; wages are that part of the cost of the finished product given to those who perform service in its production.

The operators of a packing plant cannot, by law, be compelled to sell the finished product of their plants at a price that will not allow them a fair return upon the investment, but that does not say that those operating the packing plant cannot be compelled by law to pay a living wage to their employees, notwithstanding the fact that the plant is being operated at a loss. An industry of any kind that cannot be operated except at the sacrifice of its employees ought to quit business. An industry ought not be permitted to recoup its losses out of the wages of its employees, where those employees are in such a condition that they cannot prevent it. It may be argued

that a laboring man is not compelled to work for any particular employer, and that the laboring man can quit at any time and go elsewhere. So far as the law is concerned, this is true—he has an absolute right to go and seek work in some other place; but actually, and in fact, it is often impossible for a working man to quit the work in which he is engaged and readily find other work. Economic conditions are such that, most of the time, when a working man finds himself out of work, he must remain out of work for days, weeks, and months, during which time he and his family suffer. Many a working man cannot quit when he desires so to do. He must continue to work although his wages are not sufficient to properly feed and clothe himself and his family and educate his children. Public welfare demands that all industries that provide food, clothing, fuel, and transportation shall continue to operate because without their operation suffering must result; but public welfare likewise demands that the working man engaged in the production of the things that minister to the comfort of all, must be paid such compensation for his services as will enable him to live in the manner described in the court of industrial relations act.

The defendant is operating its plant at a loss. Why, does not appear from the evidence. At least, this court is unable to determine why, and for the purpose of this discussion, it is unnecessary to ascertain why. The plant may be badly located on account of transporation facilities. There may have been mismanagement. A part of the money arising out of the operation of this plant may have been taken by the Allied Packers and used in the operation of the other plants conducted by them. It may have been that the loss was due to unstable conditions in live stock and meat markets prevailing during the time covered by the investigation of the court of industrial relations. The defendant contends that to prevent operating its plant at a loss, it must have its employees work for less than what the court of industrial relations has determined are living wages. In other words, the defendant is trying to prevent loss in its business by putting the loss on its employees. That should not be done if its employees are thereby compelled to work for less than living wages. If the plant cannot operate without so doing, it is only a question of a short time until it must stop. If the plant is badly located on account of transportation to its market or from the source of supply of its raw material, it ought to be moved to where these handicaps will not exist. If the loss is caused by managerial

Court of Industrial Relations v. Packing Co.

faults, they ought to be corrected. Recoupment of losses caused by either of these matters ought not to be brought about by compelling the working man to labor for less than a living wage.

The defendant should be compelled to pay the wages fixed in the order made by the court of industrial relations, and should be compelled to establish the hours of labor there fixed, and should look elsewhere to recoup its losses and find the means of operating its plant at a profit.

A peremptory writ of mandamus will issue to compel the defendant to put into effect those parts of the order of the court of industrial relations numbered 2, 3, 4, 9, 11, 14, 15, 17, 18, and 19.

BURCH, J. (dissenting) : I find myself halted at the very threshold of this litigation. So far as it is involved in this case, the act creating the court of industrial relations belongs in the class of statutes beginning to be known in the field of constitutional law as emergency statutes. The court of industrial relations is to do for this state, by means of orders respecting the conduct of essential industries, what congress did for the United States when it passed the Adamson law, and what the legislature of New York did for the people of that state when it passed the emergency housing laws. The statute was interpreted in this manner in the case of *The State, ex rel., v. Howat,* 109 Kan. 376, 198 Pac. 686, and in the original opinion in this case (*Court of Industrial Relations v. Packing Co.,* 109 Kan. 629, 201 Pac. 418). The legislature did not completely socialize the manufacture of food products, the manufacture of clothing, and the production of fuel, and the mere fact that the defendant conducts one of the essential industries is not enough to subject its business to state control. The legislature had in mind the coal strike of 1919-1920, and merely authorized intervention by the court of industrial relations to insure such efficiency and continuity in production of the necessaries of life as will save the people from annoyance and distress. In the Howat case it was said:

"Continuous production, and production according to the approval of an efficiency expert, are not required at all. Only that continuity and efficiency are required which will secure the people from privation and oppression. . . . A controversy between employer and workers, or between groups or crafts of workers, which endangers production, creates an emergency, with which the court may deal. . . .

"Section 9 does not authorize a general revision of labor contracts." (pp. 414, 415.)

To be cognizable by the court of industrial relations, the nuisance of strife, disorder, and waste, and the menace of public peace, public health, and public welfare generally, consequent on industrial controversy, must be related to the ultimate object of the statute.

Applying the foregoing interpretation of the statute to the present case, until a controversy brings within reasonable contemplation a discomforting shortage in the supply of food which the defendant produces, public interest does not attach to the conduct of its business, and the powers conferred by the statute are not called into action.

It seems quite clear the court of industrial relations did not act on this interpretation of the statute. It evidently believed that on simple complaint it could regulate conduct of the defendant's business, and it even went far beyond the complaint presented to it, in its regulations.

The complaint to the court of industrial relations alleged broadly that the controversy between the defendant and its employees was one which endangered continuous operation and efficiency of the service rendered by the defendant's plant, and that the controversy affected, and would affect, the manufacture and production of commodities necessary for human food within the state of Kansas. The petition to this court pleaded this complaint, and the court properly enough held that the petition sufficiently alleged an emergency had arisen which justified the industrial court in taking cognizance of the complaint. (*Court of Industrial Relations v. Packing Co.,* 109 Kan. 629, 635, 201 Pac. 418.) The court now says, in effect, that the evidence taken by commissioner Noble established the fact that an emergency had arisen such as the statute contemplates. Presumably the court refers to the evidence bearing upon the meager facts stated in the opinion. If the court refers to other evidence establishing a statutory emergency, I have not been able to discover it by searching the record.

Mr. Charles Wolff, president and general manager of the defendant, testified as follows:

"Q. Where are your products sold, Mr. Wolff? A. Throughout the United States; also do some export business.

"Q. What proportion of your sales of your products is made in the state of Kansas, as compared with the whole amount of the business? A. Well, I don't know exactly what the percentage would be, but of course it would be a small per cent. . . .

Court of Industrial Relations v. Packing Co.

"Q. Is there any competition in the business in which this company is engaged? A. Yes, we have plenty of competition."

It is a matter of common knowledge that the packing industry of Kansas is one of immense magnitude. It is not necessary to present the statistics. No one would attempt to deny that the quantity production of packing-house products in Kansas is enormous. Only a small percentage of the product of the defendant's small plant is sold in Kansas, and if the plant were to close premanently the defendant's trade would be absorbed by competitors so quickly the people of the state who consume Wolff products would not be inconvenienced for a single meal, and the people of the state generally would not be affected at all.

Approximately 300 of the defendant's employees are members of a local union of the Amalgamated Meat Cutters and Butchers Workmen of North America. The stock of the defendant is owned by the Allied Packers, a corporation owning packing plants in Boston, Mass., Wheeling, W. Va., Macon, Ga., Richmond, Va., Buffalo, N. Y., and one plant in Canada. In the testimony are some allusions to a threatened strike of members of the meat cutters and butchers organization, on account of controversies with packing companies other than the Allied Packers, over violations of an agreement to which the Allied Packers was not a party. Possibility that this strike might occur no longer existed when the order of the court of industrial relations was promulgated, and the opinion of the court of industrial relations accompanying its order makes no reference whatever to any emergency respecting the food supply of the people of this state, except in summarizing the complaint which initiated the investigation. The order was not based on any menace to the food supply of the state, and could not be, because it was not possible that suspension of operation of the defendant's plant could appreciably affect that supply.

Industries concerned with furnishing food, clothing, and fuel, are segregated by the statute for regulation. A controversy cognizable by the court of industrial relations, for purposes not merely of investigation but of regulation, must be definitely related to the subject of supplying the state with the necessaries of life, and must create an emergency respecting that supply, or basis for the classification of industries fails, and the classification becomes arbitrary. In this instance, not only were the fundamental elements of emer-

gency lacking, but elements which, under other circumstances, might contribute to an emergency, were not present.

Employees of the defendant testified that what they wanted was an eight-hour day, regardless of pay for extra hours. While the defendant has yards for accommodating live stock, and has facilities for refrigerating its products, it is a small, local plant, depending on an irregular local live-stock market, which it must maintain, or lose altogether, and the following finding by commissioner Noble is fully sustained by the evidence:

"By reason of the limited capacity of the plant, especially the refrigeration and storage, and the limited market for live stock at Topeka, it is impracticable to operate this plant with shifts of workmen, or to use more than one set or shift of workers in its general operation. The plant is the only quantity purchaser at Topeka of live stock for killing, and except to a limited extent, the packing company does not have control or advance notice of the quantity of live stock which will be delivered, or when. It is also practically necessary that the plant purchase all of the live stock offered and delivered in order to hold the market, the purchases being made on the basis as to price of the competitive market at Kansas City. It is also practically necessary that all live stock purchased be killed within a limited time after it is received at the yards, and when killed it is necessary that the operations continue without cessation until the meat is placed in refrigeration. Therefore, on some days the operation of the greater part of the plant will necessarily occupy only a few hours, and on other days more than eight, or even nine hours, depending largely upon the amount of live stock on hand for killing, and the condition is one that cannot practically be controlled by the respondent. The most arduous labor, that of the killing gang, working on what is spoken of in the evidence as the "chain," is not continued more than eight hours a day, but the extra time is generally consumed in the cleaning-up work after the killing is over. The operation of the plant would not afford sufficient working hours per week to hold the men if those in the killing gang were not afforded other work in the plant besides the actual killing. Since the abolishment of extra pay for time over eight hours, the number of hours of work per day at the plant has not changed materially from those which obtained during the period covered by the expired contract."

It is regrettable that men and women should be tempted, in order to earn a living, to accept employments calling upon them to overtax their strength. In this instance, however, we are confronted by this dilemma: Continuity and efficiency of operation of the defendant's plant must be maintained, in order that the people of the state may be supplied with food; the defendant's plant is so located, is of such size, and must operate under such conditions, that its employees must sometimes work more than eight hours per day; because overwork ultimately impairs ability to produce, this fact

Court of Industrial Relations v. Packing Co.

creates an emergency under the statute with which the court of industrial relations should deal; to correct the evil which constitutes the emergency, working more than eight hours a day must be prohibited; to prohibit working more than eight hours a day will close the defendant's plant; and so a regulation nominally in the interest of continuity and efficiency of production puts an end to the defendant's contribution to production.

The court of industrial relations recognized the fact that the defendant's employees must work extra hours when necessary. In the opinion accompanying the order it was said:

"The respondent's evidence shows that it is unable to control the supply of live stock. Farmers and stock raisers will ship in the live stock when it is ready to ship; and so, in spite of all the management can do to keep up a steady supply, there will be times when the yards fill up and it becomes necessary, in order to avoid great loss to the company, to run more than eight hours a day."

The court of industrial relations theorized on the subject of paying time and a half for overtime, as follows:

"Overtime should not be considered in the light of extra pay; the wage should be fair on the eight-hour basic day. Overtime should be considered as a penalty upon the company to prevent the long hours and exhaustion of the workers."

Commissioner Noble, sticking to the facts, concluded his finding, quoted above, as follows:

"Therefore, the commissioner finds that the hours of employment of the workers generally in the plant are governed by conditions over which the respondent has not practical control, and that the only effect of the establishment of a basic eight-hour day in the court's order would be upon the rate of wages required to be paid; that, however it might be regarded in other cases, the basic day in this order is a wage provision rather than a working condition."

This takes working more than eight hours a day out of the case as something creating an emergency, and leads to consideration of the subject of wages in the defendant's plant, as creating an emergency in the food supply of the people of this state.

Commissioner Noble returned the following finding:

"The net change of wages put into effect by the packing company on January 17, 1921 [which brought on the controversy], was slight beyond the abolishment of the 5-cent-per-hour-bonus and the extra pay for overtime. Some wages were raised, more were unchanged, and the remainder were lowered from 2½ per cent to 14 per cent, making an average reduction in the hourly wage throughout the plant of less than a half cent per hour, . . ."

The court of industrial relations contends the reduction was greater. In any event, the reduction was small, and the presiding judge of the court of industrial relations testified before commissioner Noble concerning the wage scale contained in the court's order as follows:

"In the final wage scale that we made we believed that we had not in any very serious, to any very serious extent, increased the wage as fixed by the company in its posted notice. . . . We realized that we possibly had increased some, but we felt not sufficiently to cripple the company financially in any serious way."

The actual increase is not material. Whatever it may have been, the court of industrial relations did not regard the wage scale of the defendant's plant as so low that, by degrading labor, it limited production of one of the necessaries of life to such an extent as to create an emergency, and it could not have been so regarded.

Strikes are infectious things. They may spread from plant to plant, and from industry to industry, and may invite exercise of all the power the court of industrial relations possesses. But there was no strike. Many of the defendant's employees are old residents and responsible citizens of the city of Topeka, and the testimony shows they were not under domination of agitators. The leaders were earnest, sensible, law-abiding men and women, who believed they were unjustly treated. There was evidence that the supply of labor available to the defendant was abundant, and a previous strike, the only one in the history of the plant, was little more than fifty per cent effective, and lasted but a short time. Sections 17 and 18 of the court of industrial relations act, prohibiting and punishing picketing, intimidation, and other trouble-making incidents of a strike, were available for preservation of the public peace, had a strike occurred.

Taking into account the relation of the defendant's product to the food supply of the state, and the entire situation existing at the defendant's plant when the controversy arose, I am unable to discover anything approaching an emergency such as the statute contemplates, and regard the order of the court of industrial relations as improvidently made. Since I do not reach consideration of the legal questions raised by assuming an emergency, it would appear officious for me to discuss them.

Porter, J., concurs in this dissent.